HISPANICS UNITED OF DuPAGE COUNTY, et al., Plaintiffs,

v.

VILLAGE OF ADDISON, ILLINOIS, Defendant.

UNITED STATES of America, Plaintiff,

v.

VILLAGE OF ADDISON, ILLINOIS, Defendant.

Nos. 94 C 6075, 95 C 3926.

United States District Court, N.D. Illinois, Eastern Division.

Dec. 22, 1997.

---

Robert L. Graham, Edward Jacob Lewis, II, Thomas Charles Buchele, Dan Avram Rosenbaum, Jennifer A. Burke, Jenner & Block, Chicago, IL, Dana Helene Sukenik, Gessler, Hughes & Socol, Ltd., Chicago, IL, for Plaintiffs Hispanics United of DuPage County, Leadership Council for Metro. Open Communities, Hispanic Council.

Matthew J. Piers, Jonathan A Rothstein, Charles James Holley, Gessler, Flynn, Fleischmann, Hughes & Socol, Ltd., Chicago, IL, Theresa Ann Amato, Elmhurst, IL, James Gerard Bradtke, Jennifer Kay Soule, Soule & Bradtke, Chicago, IL, Dana Helene Sukenik, Gessler, Hughes & Socol, Ltd., Chicago, IL, for Plaintiffs Leopoldo Alcaraz, Debra J. Cagle, John J. Cagle, Marcella Carrillo, Rojelio Carrillo, Carl Conti, Maudie Conti, Rita Gonzalez, Oralia Herrera, Martin Hurtado, Camille Husby, Marvin Husby, Estela Ibarra, Francisco Ibarra, Salbadoe Ibarra, David Sanchez, Jose Angel Rivera, Maria Torres, Elisa Vargas, Marcelino Vargas, Jose Villanueva, Maria Villanueva, Amparo Rojas, Jose Rojas, Jesus Rojas, San Juan Rojo, Guadalupe Solis.

Norma Jean Guess, Barry L. Moss, Daniel C. Shapiro, Moss & Bloomberg, Ltd., Bolingbrook, IL, James L. DeAno, Norton, Mancini, Argentati, Weiler & DeAno, Wheaton, IL, Daniel E. Reidy, James R. Daly, Steven Allen Wright, Jones, Day, Reavis & Pogue, Chicago, IL, Stuart David Gordon, Zukowski, Rogers, Flood & McArdle, Chicago, IL, Thomas R. Mancini, Argentati, Weiler & DeAno, Chicago, IL, Roger Kevin O'Reilly, Law Offices of Roger Kevin O'Reilly, Wheaton, IL, for Defendant Village of Addison, Ill.

## *MEMORANDUM OPINION AND ORDER RULING ON FAIRNESS OF PROPOSED SETTLEMENT*

CASTILLO, District Judge.

### *TABLE OF CONTENTS*

I. *BACKGROUND* ...................................................... 1135
   A.   Relevant Procedural History ..................................... 1136
   B.   Relevant Facts ................................................ 1136
       1.  Addison, Green Oaks and Michael Lane ...................... 1136
       2.  The Camiros Study ........................................ 1137
       3.  Village Action Affecting Green Oaks and Michael Lane Before 1994 ..................................................... 1138
       4.  Kane McKenna's Findings .................................. 1138
       5.  Racial Composition of the TIF Districts ..................... 1139
       6.  The TIF Adoption Process and Village's Course of Action ............ 1139
         (a.) The Army Trail/Mill Road TIF ............................... 1139
         (b.) The Michael Lane TIF ..................................... 1140
       7.  Evidence on Conditions in Green Oaks and Michael Lane ............. 1141
         (a.) Housing Code Violations .................................. 1141
         (b.) Lack of Property Maintenance ............................. 1142
         (c.) Density/Lack of Green Space .............................. 1142
       8.  Village Awareness of Green Oaks and Michael Lane's Racial Composition .............................................. 1143

II. *THE PROPOSED CONSENT DECREE* ................................. 1144
   A.  Ban on Housing Discrimination by the Village of Addison ................. 1144
   B.  Redevelopment Plan ........................................... 1144
   C.  Monetary And Other Compensation ................................ 1146

D. Relocation Assistance .......................................... 1148
E. Fair Housing Education ......................................... 1149
F. Time Period and Enforcement of Consent Decree ......................... 1149

III. *THE STANDARDS FOR JUDICIAL APPROVAL OF CLASS ACTION SETTLEMENTS* ...................................................... 1149
  A. The Strength of Plaintiffs' Case ...................................... 1150
    1. Legal Standards Applicable to Fair Housing Act Claims .............. 1150
    2. The Parties' Arguments on Discriminatory Impact .................... 1152
    3. Applying the *Arlington Heights II* Factors ......................... 1153
      (a.) Discriminatory Effect ......................................... 1154
      (b.) Evidence of Discriminatory Intent ............................. 1157
        (i.) TIF Boundaries and Activities ............................. 1158
        (ii.) Legislative History of and Events Surrounding Adoption of the Army Trail/Mill Road TIF .................... 1158
        (iii.) Village Knowledge of Green Oaks and Michael Lane Demography .............................................. 1159
      (c.) The Village's Interest in Taking the Actions Producing Discriminatory Effect ........................................ 1159
        (i.) Burden of Proof ......................................... 1160
        (ii.) The Village's Interests In Its Actions ..................... 1162
      (d.) Relief Requested ............................................. 1163
    4. Balancing the *Arlington Heights II* Factors ........................ 1163
  B. Comparison of Uncertain Litigation Results to Consent Decree .............. 1164
  C. The Village of Addison's Ability To Pay .............................. 1166
  D. Complexity, Length and Expense of Further Litigation .................... 1166
  E. Amount of Opposition To The Settlement/Class Members' Reactions ....... 1166
  F. Presence of Collusion in Reaching A Settlement ........................ 1169
  G. Adequacy of Compensatory Damages ................................ 1170
  H. Opinion Of Competent Counsel ...................................... 1170
  I. Stage Of the Proceedings And The Amount Of Discovery Completed ....... 1170

CONCLUSION ................................................................ 1171

## I. *BACKGROUND*

The hallmark of a great society—a true racially and ethnically integrated community—is an elusive goal that unfortunately still has not been achieved in most urban and suburban communities. The consolidated lawsuits pending before this Court involve one suburban community's struggle with the issue of racial and ethnic diversity. In 1994, the Village of Addison began purchasing and demolishing multifamily residential structures in two of the Village's largest Hispanic neighborhoods. Claiming that these areas and their surrounding environment were "blighted," the Village implemented the powers of acquisition and condemnation granted it by Illinois' Tax Increment Allocation Redevelopment Act, a tool for financing municipal redevelopment projects. Residents and property owners in these two districts, along with organizations working to eliminate housing discrimination against Hispanics, promptly sued the Village alleging, *inter alia*, that the Village's prior and planned acquisition and demolition had a disparate impact on Hispanic residents and constituted intentional discrimination in violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*

This three-year-old, hotly contested housing discrimination case is presently before the Court on the parties' joint motion for final approval of a proposed settlement for the plaintiff class. Pursuant to the Court's preliminary approval of the proposed Consent Decree ("the Decree"), appropriate notice was given in both the English and Spanish languages to all class members via both publication and direct mail notice. Thereafter, on October 30, 1997 at 7:00 p.m., this Court held a class fairness hearing in Addison, Illinois. The Court departed from the normal practice of holding this hearing during normal working hours in the downtown federal courthouse because it wanted to ensure that all interested persons could easily testify at this hearing. This was especially

important because the Decree directly affects only residents of the Addison, Illinois community. This Court also inspected the neighborhoods affected by the litigation and the Decree with the attorneys for the parties on the afternoon of October 30, 1997, in preparation for the fairness hearing.

Before proceeding to describe the proposed settlement, it is important to set the context by reviewing the relevant procedural history and facts that surround this litigation.

### A. Relevant Procedural History

On October 6, 1994, the lawsuit entitled *Hispanics United of DuPage County, et al. v. Village of Addison, et al.*, No. 94 C 6075, was filed and assigned to this Court. Thereafter, the defendants agreed to a "stand still/status quo" order that would prevent any demolition of buildings in Addison without approval of this Court. On April 21, 1995, this Court granted the plaintiffs' motion for class certification. *See Hispanics United of Dupage County v. Village of Addison, Ill.*, 160 F.R.D. 681 (N.D.Ill.1995).

On July 7, 1995, the Department of Justice filed its related lawsuit, *United States of America v. Village of Addison*, No. 95 C 3926, and this action was consolidated with the *Hispanics United* suit. From early 1995 to the present, the parties have concentrated on two principal activities: (1) preparing the consolidated lawsuits for trial and (2) determining whether any settlement could be achieved. The Court set two different firm trial dates in this case. The first firm trial date of April 22, 1996 was vacated on April 11, 1996 based on a tentative settlement accord, which in essence created the foundation for the current proposed settlement before this Court. This preliminary April 1996 accord was achieved on the eve of the first firm trial date, only after the conclusion of all pretrial discovery, the filing of a final pretrial order, and the Court's ruling on various motions in limine regarding contested evidentiary matters. During this time period, numerous settlement conferences were held. The

Court received assistance in this process, and wishes expressly to commend former federal Judge Nicholas J. Bua for his fine mediation efforts in this case in his capacity as Special Master. The Court also wishes to commend Magistrate Judge Rebecca C. Pallmeyer for her outstanding efforts in supervising the preparation of an appropriate final pretrial order in this difficult and complex case.

The parties were unable to finalize their settlement during the remainder of 1996, forcing this Court to set a new firm trial date of May 27, 1997. Prior to this date, the parties again prepared for trial and the Court ruled on various new pretrial motions, including the defendant's motion for partial summary judgment, which principally addressed standing. *See Hispanics United of DuPage v. Village of Addison*, 958 F.Supp. 1320 (N.D.Ill.1997) (motion granted in part and denied in part). In April of 1997, this Court issued further evidentiary rulings concerning several new motions *in limine* in final preparation for trial. During that month, the plaintiffs also filed a motion for partial summary judgment on liability for disparate impact discrimination. This motion was fully briefed and awaiting ruling by the Court when the parties reached a settlement.

On May 21, 1997, a mere six days before the start of trial, the Court granted the parties' oral motion for preliminary approval of the Decree presently before the Court. Following are the facts as they stood on the eve of trial.

### B. Relevant Facts [1]

#### 1. Addison, Green Oaks and Michael Lane

The Village of Addison, population 32,058,[2] lies some 20 miles to the west of Chicago. Pls.' Facts ¶¶ 1, 3. Its Hispanic population has grown in recent years, from 5.8% in 1980 to 13.4% in 1990. Pls.' Facts ¶¶ 2–3. Although Hispanics live in a number of areas

---

[1]. The facts are derived from fact statements that the parties filed in conjunction with the plaintiffs' motion for partial summary judgment, which was pending at the time of the settlement. *See*

Northern District of Illinois Local General Rule 12(M)-(N).

[2]. This figure is based on the 1990 Census.

throughout the Village, *see* Pls.' Ex. E, there are two neighborhoods in which the Hispanic population is heavily concentrated: Green Oaks and Michael Lane. Since 1990, both neighborhoods have been majority Hispanic. Pls.' Facts ¶ 7. In fact, Michael Lane and Green Oaks are the only majority Hispanic areas in the Village, and contain its two largest Hispanic populations. Pls.' Facts ¶¶ 11–12.

Prior to 1994, the two neighborhoods furnished nearly a quarter of the Village's rented housing, most of it accessible to moderate- and low-income families. These two neighborhoods were first developed in the 1960s, and were approved by the Village at that time. Pls.' Facts ¶ 17. All the buildings in Green Oaks and Michael Lane are low-rise structures less than thirty-five years old and of an average age for multi-family residential units in Addison. Pls.' Facts ¶¶ 18–19; Def.'s Facts ¶ 18. Located on the northeast side of the Village, Michael Lane has 109 buildings divided into 619 units; Green Oaks, on the southwest side, consisted of 35 buildings containing 208 units before the Village began acquisitions and demolition in 1994. Def.'s Add'l Facts ¶¶ 98–99. The total number of rental units in Addison lies somewhere between 3258 and 3902. Pls.' Facts ¶ 23; Def.'s Facts ¶ 23. Residential vacancy rates in Green Oaks and Michael Lane hover between 2 and 4%, compared to the Village-wide rate of 2.7%. Pls.' Facts ¶¶ 20, 25. As of 1990, the apartments in Michael Lane and Green Oaks rented for an average of $568 a month, affordable housing by DuPage County standards. Pls.' Facts ¶ 21; Def.'s Facts ¶ 21. A majority of the neighborhoods' residents earn moderate or low incomes: in 1991, a survey of Michael Lane households

reported that 66% had annual incomes of less than $25,100 and that 54% earned less than $21,700; in 1992, 63.49% of Green Oaks residents were classified as "very low income" and 76.19% as low- and moderate-income persons. Pls.' Facts ¶ 22.

### 2. The Camiros Study

In 1988, the Village hired a planner, Camiros Ltd., to examine the Michael Lane area and recommend ways in which it could be improved. Def.'s Add'l Facts ¶ 103. Green Oaks was not included in the study. Camiros' preliminary investigation suggested that Michael Lane would meet the statutory requirements for redevelopment under the Illinois Tax Increment Allocation Redevelopment Act, 65 ILCS 5/1174.4–1 *et seq.* Def.'s Add'l Facts ¶ 104. This statute, passed in 1977, permits municipalities to use a device called "tax increment financing" ("TIF") in order to fund redevelopment projects. Def.'s Add'l Facts ¶ 122; Pls.' Facts ¶ 46. Regions that meet the statute's definition of a "blighted" area may be incorporated into TIF districts, where the municipality is then authorized to acquire property in the district, by contract or condemnation, and demolish it. Pls.' Facts ¶ 47; *see* 65 ILCS 5/11–74.4–3(a), § 74.4–4(c), (d).[3] In support of its suggestion that Michael Lane exhibited characteristics of blight, Camiros observed that Michael Lane residential property values were stagnant or declining, and that the area reflected "crowded living conditions" and "overall poor property maintenance." Def.'s Ex. 28 at Bates # 400006. It noted that the buildings stood closer together than would be permitted under the Village's current standards and did not include enough space for off-street parking. *Id.*

---

**3.** For an "improved," e.g., residential, area to qualify as "blighted" under the statute, it must possess five or more characteristics of blight that, combined, render the area "detrimental to the public safety, health, morals, or welfare." 65 ILCS 5/11–74.4–3(a). These factors include

> age; dilapidation; obsolescence; deterioration; illegal use of individual structures; presence of structures below minimum code standards; excessive vacancies; overcrowding of structures and community facilities; lack of ventilation, light or sanitary facilities; inadequate utilities; excessive land coverage; deleterious land use or layout; depreciation of

physical maintenance; [and] lack of community planning....

*Id.* Once designated as blighted, the region may become part of a "redevelopment project area," in which the governing municipality may "acquire by purchase, donation, lease or eminent domain" land and property "all in the manner and at such price the municipality determines is reasonably necessary to achieve the objectives of the redevelopment plan and project." *Id.* § 74.4–4(c). In addition, the municipality is authorized to "clear any area by demolition or removal of existing buildings and structures." *Id.* § 74.4–4(d).

As requested, Camiros recommended steps for enhancing Michael Lane's appearance and living conditions. It suggested making street and gutter improvements and continuing housing inspections, and explained in detail ways in which to improve both private and public areas in the neighborhood. Def.'s Add'l Facts ¶ 104; Pls.' Supp. Ex. 31. This undertaking, Camiros stressed, had to be the product of "an agreed-upon strategy that brings the public and private sectors together into a partnership venture." Def.'s Ex. 29 at Bates # 4000012. It is undisputed that Village officials held a meeting attended by several Michael Lane building owners, and discussed at least some of the Camiros study findings. June 29, 1995 Block Dep. at 22; January 11, 1996 Block Dep. at 335. The Village maintained, based on the testimony of one the trustees who ran the meeting, that it tried to implement Camiros' suggestions, but the building owners showed no interest. Def.'s Add'l Facts ¶.107. Plaintiffs, on the other hand, claimed that the Village did not tell the property owners about all the options posed by Camiros, for example, creating a subsidized low-interest loan program for improvement and rehabilitation. *See* Pls.' Supp. Ex. 32. Plaintiffs also pointed to the testimony of Barbara Berlin, the Camiros employee in charge of the Michael Lane study, that the Village was less than enthusiastic about pursuing a number of Camiros' recommendations. April 24, 1997 Berlin Dep. at 72–77. Berlin also told the Village Finance and Policy Committee that "[t]here seems to be some interest in participating in a program" on the part of Michael Lane building owners. Pls.' Supp. Ex. 33 at Bates # 030329.

### 3. Village Action Affecting Green Oaks and Michael Lane Before 1994

Following the Camiros study, the Village took a number of actions affecting Michael Lane and Green Oaks. In November 1988, the Village began to enforce in these areas its ban on overnight street parking. Pls.' Facts ¶ 43. Although the ordinance had long been on the books, and applied Village-wide, this was the first time that the Village had enforced it in Green Oaks and Michael Lane. *Id.* The Village notified residents by letter that it was going to start enforcing the ban.

Pls.' Facts ¶¶ 44–45. On November 10, 1988, Village Trustee Raman Thakker sent letters to Green Oaks property owners requesting a meeting to discuss alternate parking solutions for the area. Def.'s Add'l Facts ¶ 108. One of the Village's suggested remedies for alleviating the ban's effects was to have building owners rent additional spaces in a nearby shopping center parking lot. Def.'s Add'l Facts ¶ 120.

In the early 1990s, the Village applied for financial assistance from DuPage County to help fund street, common area, and sewer improvement projects in the Green Oaks and Michael Lane neighborhoods. The funding source was DuPage County's Community Development Block Grant ("CDBG") Program. In 1991, the Village requested CDBG funding to improve the Green Oaks neighborhood street and drainage system, creek channel, and parking alley. Def.'s Add'l Facts ¶ 114. The same year, the Village applied for CDBG assistance to resurface the streets, remove and replace curbs, improve drainage, upgrade common parking facilities, and bury overhead utility wires in Michael Lane. Def.'s Add'l Facts ¶ 115. In 1992, the Village spent $119,403.03 on Green Oaks Court improvements, including storm sewer, curb and gutter replacements. Pls.' Resp. Add'l Facts ¶ 116. Although its source of funding is unclear, a 1992 storm sewer construction project in Michael Lane cost $75,684. Def.'s Add'l Facts ¶ 117.

### 4. Kane McKenna's Findings

The sequence of events in 1993 and 1994 led directly to the adoption of TIF districts containing the Green Oaks and Michael Lane neighborhoods. In 1993, the Village hired Kane McKenna, a municipal finance consulting firm that has qualified nearly 100 TIF districts, to evaluate a proposed TIF district in Addison. Pls.' Facts ¶ 56; Def.'s Add'l Facts ¶ 127. Termed the "Army Trail/Mill Road TIF," the proposed district included Green Oaks, as well as the Army Trail Plaza Shopping Center, vacant land owned by the Moody Bible Institute, and the Addison (a.k.a.LaLonde) Courts Apartments. Def.'s Add'l Facts ¶ 129. In January 1994, Kane McKenna made a preliminary determination

that the Army Trail/Mill Road area satisfied over five "blighting" factors delineated in the TIF statute and, consequently, qualified for TIF status. Def.'s Add'l Facts ¶ 128. As a whole, the area was reported to exhibit blight in terms of age, depreciation of physical maintenance, deleterious land use, inadequate utilities, code violations, and lack of effective community planning. Def.'s Add'l Facts ¶ 128; Pls.' Resp. Add'l Facts ¶ 128. As mandated by statute, the report found these characteristics present to a "meaningful extent" throughout the area; however, the report's primary focus was on the area's commercial property, specifically, the Army Trail shopping center. *See* Def.'s Ex. 48. On March 21, 1994, the Village enacted an ordinance establishing the Army Trail/Mill Road TIF district, which encompassed Green Oaks and the other areas studied by Kane McKenna. Pls.' Facts ¶ 4; Def.'s Add'l Facts ¶ 129.

After adopting the Army Trail/Mill Road TIF, the Village expressed interest in having Kane McKenna investigate another proposed district. June 2, 1995 Murphy Dep. at 257. In May 1994, the Village sent Kane McKenna the Camiros study on Michael Lane, which helped describe the area that the Village wished to include in the district. Def.'s Add'l Facts ¶ 133. Kane McKenna prepared a draft report for the "Proposed Michael Lane Area Redevelopment Project" in July 1994, which determined that, like the Army Trail/Mill Road district, the Michael Lane area qualified for TIF treatment. Def.'s Ex. 57. Included in the study area were Michael Lane, two retail centers, and some vacant land. *See* Def.'s Ex. 57. The report determined that the region contained the following blighting factors: depreciation of physical maintenance, excessive land coverage, lack of community planning, presence of structures below minimum code standards, deleterious land use and/or layout, inadequate utilities, and age. *Id.* These factors were found present to a "meaningful extent" throughout the area. *Id.* On October 3, 1994, the Village

passed ordinances establishing the Michael Lane TIF district. Def.'s Add'l Facts ¶ 136.

### 5. Racial Composition of the TIF Districts

The Army Trail/Mill Road and Michael Lane districts are the only TIFs that the Village adopted; within their boundaries resides 43.7% of the Village's total Hispanic population. Pls.' Facts ¶ 9. Compared to a Village-wide population of 13.4%, Hispanics comprise 49.4% of the TIF districts. Pls.' Facts ¶¶ 3, 10. In fact, the TIFs encompass the two largest Hispanic neighborhoods—and contain the two highest concentrations of Hispanics—in the Village. Pls.' Facts ¶¶ 8-9. The TIFs' Hispanic resident population is mirrored in building ownership—42.9% of the buildings in Green Oaks and 34.9% of the buildings in Michael Lane are Hispanic-owned. Pls.' Facts ¶ 16. In contrast, the areas surrounding the TIF districts are predominantly white. Pls.' Facts ¶ 14. The map prepared by the Village showing Hispanic population distribution throughout the Village (Pls.' Ex. F), viewed in conjunction with the map outlining the TIF districts (Pls.' Ex. BBB), reveals a stark contrast between the concentration of Hispanics within the TIF districts and the surrounding majority white areas.

### 6. The TIF Adoption Process and Village's Course of Action

#### (a.) The Army Trail/Mill Road TIF

Following Kane McKenna's recommendation in January 1994 that the Army Trail/Mill Road area qualified for TIF status, but before passing the ordinance establishing the area as a TIF district, the Village held a public hearing on March 7, 1994. Trustee (now Mayor) Lorenz Hartwig presided as President Pro Tem.[4] He assured residents at the meeting that "no plans have been made at this time" for properties within the Army Trail/Mill Road area, that the Village wanted to do the least possible to accomplish its goals, that it was "not anxious" to use its TIF

---

4. Addison is governed by a Mayor (or Village President) and a six-member, elected Board of Trustees. Currently, the six Trustees are: Mayor Lorenz Hartwig, Angelo Chrysogelos, Don LaPato, Sylvia Layne, Harry Theodore, and Richard

Veenstra. Anthony Russotto served as mayor until his death in the Spring of 1995. No Hispanic has ever served on the Board of Trustees. Pls.' Facts ¶ 84.

condemnation powers, that the Trustees "wanted public input all along the way," and that "all decisions have to be made at public hearings." Pls.' Facts ¶ 52; Pls.' Ex. Y at Bates # 001589–001612. Two weeks later, on March 21, the Village Board of Trustees approved the ordinance creating the Army Trail/Mill Road TIF district. Def.'s Facts ¶ 53.

After approving the TIF district, the Village began purchasing buildings in Green Oaks and filing condemnation suits against owners who refused to sell their buildings. Pls.' Facts ¶ 60. On March 28, 1994, the Trustees held an Executive Session Meeting, during which they authorized the Village Manager, Joe Block, to begin acquiring buildings in Green Oaks. Pls.' Facts ¶ 54. Village President Anthony Russotto stated that "he would like to buy the center core first, we can buy and demolish more buildings this way." Pls.' Ex. N. Block told the Board that "he [could] probably accomplish the purchase and demolition and get started now." *Id.* In response to this statement, Trustee Chrysogelos asked about "the displacement of the Hispanic tenants that total approximately 50% in the area." *Id.* No reply is recorded in the minutes. By April of 1994, the Village had performed appraisals on each of the 28 four-flat buildings in Green Oaks. Pls.' Facts ¶ 58. Between the time the TIF was passed on March 24, 1994 and October 6, 1994, the date plaintiffs filed this lawsuit, the Village acquired and demolished eight buildings, acquired, vacated and boarded up three more for demolition, had nine buildings pending in condemnation actions, and two others under contract to purchase— all in Green Oaks. Pls.' Facts ¶ 62; Pls.' Ex. E. Activities ceased when the parties entered a standstill agreement. Pls.' Facts ¶ 63.

Green Oaks neighborhood is the only part of the Army Trail/Mill Road TIF where the Village, in pursuing TIF redevelopment, acquired and demolished property and initiated condemnation proceedings against building owners. Pls.' Facts ¶ 64. No public planning process open to all Village residents preceded the acquisitions and demolitions; Trustee Hartwig's assessment was that the Village was receiving overwhelming informal support for its actions. Pls.' Facts ¶ 55; Def.'s Facts ¶ 55. Other than two vacant buildings in the LaLonde apartment complex, which were demolished for reasons unrelated to TIF redevelopment, the Village did not redevelop either the apartments in the majority white neighborhood on the south end of the TIF, or the vacant commercial buildings in the Army Trail Plaza Shopping Center. Pls.' Facts ¶¶ 15, 65; Def.'s Facts ¶ 65. Trustee Thakker explained that the Village had not pursued redevelopment in the commercial TIF areas because no developer had committed to the project. Thakker Dep. at 456–60.

The Village did not retain a developer or formulate a specific redevelopment plan before it undertook demolition in Greek Oaks. Pls' Facts ¶¶ 57, 66. It did, however, retain a land use planning consultant for the Army Trail/Mill Road area on July 5, 1994. Def.'s Add'l Facts ¶ 130. In addition, the Village sponsored a developers' conference in July 1994 to solicit developers interested in the TIF area. Def.'s Add'l Facts ¶ 131.

As a result of the Village's actions in Green Oaks, 44 units were demolished and 150 people displaced from their homes. Pls.' Facts ¶¶ 67, 68. Of those residents, 73, or about 50%, were Hispanic. *Id.* Although the Village considered offering financial assistance to owners and residents displaced from Green Oaks, it ultimately declined to do so. Pls.' Facts ¶ 68; Def.'s Facts ¶ 68. The Village made an affirmative choice not to include relocation assistance as a line-item budget for either the Army Trail/Mill Road or Michael Lane TIFs, against the recommendations of its TIF consultants. Pls.' Facts ¶ 68. In addition, the Village provided no oral or written communications in Spanish about the TIF districts to anyone before it began acquiring and demolishing buildings, despite having provided bilingual notices to Green Oaks and Michael Lane residents on three other occasions. Pls.' Facts ¶¶ 94–97.

### (b.) The Michael Lane TIF

The Village began discussing land acquisition in Michael Lane in May 1994, five months before it was approved as part of a TIF district. Pls.' Facts ¶ 75. During the July 1994 developers' conference designed to

solicit interest in the Army Trail/Mill Road TIF, Village officials discussed redevelopment in Michael Lane as well. Pls.' Facts ¶ 77. Following the conference, developers toured the area. *Id.* In September 1994, the Village held a public hearing on the Michael Lane TIF. It adopted an ordinance establishing the TIF district on October 3. Pls.' Facts ¶ 74.

Although it lacked a developer or a specific redevelopment plan for Michael Lane, the Village's goal was to acquire and demolish buildings in the area to reduce its density to 8 to 10 units per acre. Pls.' Facts ¶¶ 79, 82–83. Local zoning laws, however, do not require existing structures to satisfy this density standard. The 10–or–fewer units per acre figure is mentioned only in the "Village of Addison 1993 Comprehensive Plan," a "future land use plan" reflecting the Village's long-range policy on development. Def.'s Ex. 20. The plan specifies a goal of reducing density to 10 units per acre or less in multifamily areas "proposed for redevelopment" under the plan. *Id.* Nonetheless, the plan emphasizes that it is not intended to disturb "existing uses which conflict with the proposed land use." *Id.* To meet the 8–to–10–unit–per–acre target in Michael Lane, the Village would have had to demolish 359 of its 619 rental units. Pls.' Facts ¶ 79. Shortly after adopting the Michael Lane TIF, the Village suspended its redevelopment activities in the district as part of the standstill agreement with the plaintiffs. Pls.' Facts ¶ 63; Def.'s Facts ¶ 63.

In 1994, when this litigation began, Green Oaks and Michael Lane were the only two areas in the TIFs slated for TIF-funded acquisition and demolition. Pls.' Facts ¶ 48. The Village did not discuss replacing any of the units demolished or removed from the market in these neighborhoods with affordable housing until after plaintiffs had filed suit. Pls.' Facts ¶ 26.

**7. Evidence on Conditions in Green Oaks and Michael Lane**

The Village presented several reasons for including Green Oaks and Michael Lane in the TIF districts, and for embarking on a course of acquiring (and in the case of Green Oaks, demolishing) property in the neighborhoods. According to the Village, the neighborhoods were plagued by numerous, recurring housing code violations, poorly maintained property, and density/lack of open space. We summarize the evidence on these points below.

**(a.) Housing Code Violations**

Since 1985, the Village has conducted annual inspections on apartment buildings containing three or more units to ensure compliance with the Village Housing Code. Pls.' Facts ¶ 28. All residential buildings in Green Oaks and Michael Lane are subject to these inspections. *Id.* The Village relied on expert reports opining that Green Oaks and Michael Lane exhibited code violations out of proportion to the rest of the Village in certain years. Def.'s Facts ¶¶ 136–37. Compiling data from housing inspection letters itemizing code violations in 1993, one expert found that multi-family units in the two TIF districts constituted one-fourth of the housing subject to inspection, but supplied almost 45% of the code violations. Def.'s Ex. 61 at 5. Another expert reviewing housing inspection letters from 1992–1994 opined that the housing code violations in Green Oaks and Michael Lane during these years "evidence serious safety hazards, unhealthy living conditions, and a persistent lack of basic maintenance." Def.'s Ex. 62 ¶ 1. In addition, the Kane McKenna TIF qualification reports indicated that residential owners in both neighborhoods received large numbers of housing code citations before 1993. With respect to Green Oaks, Kane McKenna found that "[m]any of the residential building owners have received over 100 citations annually on average, and often repeated the same violations year after year." Def.'s Ex. 48 at 13. And in Michael Lane, "[m]any of the residential building owners received over 50 citations annually on average, and often repeated the same violations year after year." Def.'s Ex. 57 at 13. Finally, Assistant Director of Community Development John Berley testified that housing inspections in Green Oaks and Michael Lane uncovered code violations "year after year," but based on the nature of the inspection program, they would all have to have been repaired. July 11, 1995 Berley Dep. at 245.

On the other hand, plaintiffs offered evidence that all the buildings in Green Oaks and Michael Lane were certified to be in compliance with the Housing Code in 1993 and 1994. Pls.' Facts ¶ 30. Owners of multifamily apartment buildings must secure a license from the Village before they are permitted to rent any of the units; the Village will not issue a license until the building has been inspected and found to comply with the Housing Code. Pls.' Facts ¶¶ 28–29. In 1994, every building in Green Oaks and Michael Lane had a valid license. Pls.' Facts ¶ 30. Moreover, the parties agreed that the Village never determined any building in Michael Lane to be uninhabitable, and the Village did not properly dispute the fact that the housing in Green Oaks and Michael Lane cannot be considered uninhabitable. Pls.' Facts ¶¶ 31, 33. It is also undisputed that the Village never filed a condemnation suit against a property owner in Green Oaks or Michael Lane based on the presence of code violations. Pls.' Facts ¶¶ 32.

### (b.) Lack of Property Maintenance

There was evidence that rental units in Green Oaks and Michael Lane have not been well-maintained. Kane McKenna's reports found that the majority of the residential buildings in the TIF districts "suffer from visible exterior depreciation and lack of necessary interior repairs required for safety and utility needs." Def.'s Ex. 48 at 3; Def.'s Ex. 57 at 3. In Michael Lane, Kane McKenna reported that "[p]oor organization of maintenance tasks among the owners is evident," and that "[t]he residential areas have suffered from the lack of meaningful private initial investment (or reinvestment) to alleviate current blighting conditions." Def.'s Ex. 57 at 4–5. The Village, however, reportedly failed to offer residents and owners guidance in the form of housing planning or economic development to prevent blight and decline. Def.'s Ex. 48 at 13; Def.'s Ex. 57 at 5. The Village's expert reports supported Kane McKenna's conclusions on deterioration and depreciation of physical maintenance. See Def.'s Add'l Facts ¶ 139. Addison's Village Manager, Joe Block, also discussed the lack of maintenance in Green Oaks, testifying that the area "has been a great concern to the Village over the past few years with regard to the condition of the units, the density in the area and the lack of maintenance in many cases with many of the structures." March 7, 1994 Block Dep. at 12.

Plaintiffs contested the Village's evidence of insufficient maintenance with a summary of real estate appraisals conducted at the Village's behest in 1994. Independent real estate appraisers hired by the Village evaluated 35 buildings—28 of the 35 buildings in Green Oaks and 7 of the 109 buildings in Michael Lane. On a rating scale of good-average-fair-poor, 30 rated good to average, and five rated average to fair, but none fell into the "poor" category. Pls.' Facts ¶ 35. The appraisers calculated the buildings' future useful economic lives at more than 40 years. Id. Moreover, from 1992 to 1995, Green Oaks and Michael Lane housing sale prices increased 3–4% yearly. Pls.' Facts ¶ 37.

### (c.) Density/Lack of Green Space

According to the Village, Green Oaks and Michael Lane suffered, at least visually, from high density and overcrowding. Kane McKenna agreed, reporting that the buildings in Green Oaks and Michael Lane were originally constructed on lots much smaller that current zoning laws would permit, "contributing to highly dense, overcrowded complexes." Def.'s Ex. 48 at 3; Def.'s Ex. 57 at 4. In short, the neighborhoods had "too many structures located on undersized parcels." Def.'s Ex. 48 at 13; Def.'s Ex. 57 at 13. The reports further opined that "[e]xcessive land coverage . . . of some structures has likely contributed to the area's overall depreciation." Def.'s Ex. 48 at 10; Def.'s Ex. 58 at 11. A number of Village Trustees also expressed concerns that Green Oaks and Michael Lane were too dense and/or did not contain sufficient open space. See Transcript of 3/7/94 Public Hearing Re: Army Trail/Mill Road TIF at 12; Layne Dep. at 98; Veenstra Dep. at 121; Chrysogelos Dep. at 31.

Plaintiffs challenged the Village's position on density with evidence indicating that the apartments in Green Oaks and Michael Lane are no more dense than the average multifamily building in the Village, and suggested the Village's density figures for Green Oaks

and Michael Lane inexplicably changed over time. After the plaintiffs filed suit, the Village calculated densities for all multi-family units in the Village, measured in units per acre. Pls.' Facts ¶ 38. Green Oaks averaged 25 units per acre, and Michael Lane, about 24 units per acre—but Village-wide, 75% of apartment buildings had densities greater than 20 units per acre, and 67% of those were located outside Green Oaks and Michael Lane. *Id.* Before this action was filed, Village density figures for Green Oaks and Michael Lane were as low at 15 units per acre. *Id.* Finally, in contrast to Kane McKenna's conclusion that current zoning laws would require the apartments in Green Oaks and Michael Lane to be built on larger lots, the Village's 1994 real estate appraisals found that the buildings complied with local zoning laws. Pls.' Facts ¶ 35.[5]

### 8. Village Awareness of Green Oaks and Michael Lane's Racial Composition

Plaintiffs contended that discrimination, not the factors discussed above, motivated the Village to adopt the TIFs and subsequently acquire and demolish buildings in predominantly Hispanic neighborhoods. In support of this argument, they offered evidence of what they considered to be the Village's intent to discriminate. The Village hotly disputed the conclusions that plaintiffs drew from this evidence.

The Trustees knew that the Green Oaks Court neighborhood contained one of the largest Hispanic populations in the Village before they decided to include it in the Army Trail Mill Road TIF. Pls.' Facts ¶ 85. Trustee Chrysogelos informed his fellow Trustees about the approximate 50% Hispanic population in Green Oaks during the March 28, 1994 Executive Session meeting while the Trustees were discussing land acquisition in the area. Pls.' Ex. N; Pls.' Facts ¶ 90. Likewise, before beginning the process of enacting the Michael Lane TIF, the Village Trustees were told that the neighborhood was about 51 % Hispanic. Pls.' Facts ¶ 86.

Others residing in the Village or familiar with the Michael Lane and Green Oaks neighborhoods recognized that Hispanics heavily populated theses areas. Kane McKenna's Vice President, Leslie Murphy, remarked that it was "clear" and "obvious" to her that Green Oaks and Michael Lane were predominantly Hispanic. Pls.' Facts ¶ 87. Robert Rychilicki, Kane McKenna's Executive Vice President, wrote in his field notes after driving through Michael Lane: "Again, this neighborhood is *all* Hispanic, is Addison earmarking certain area or ethnic group? (This could be the perception)." *Id.;* Pls.' Ex. Q at Bates # 201564. Addison Police Officer Russell Schecht, as well as two housing inspectors deposed by the plaintiffs, were also aware that Michael Lane and Green Oaks are Hispanic neighborhoods. Pls.' Facts ¶¶ 89–90. Finally, a number of bigoted remarks at the September public hearing on the Michael Lane TIF reflect that Village residents were aware of both Michael Lane and Green Oaks' demographics. Pls.' Facts ¶ 92.

Nevertheless, at their depositions, the Trustees claimed that they either did not know or did not consider the ethnicity of Green Oaks and Michael Lane residents when they passed the TIF ordinances. Pls.' Facts ¶ 91; Def.'s Facts ¶ 91; Def.'s Add'l Facts ¶ 148. Asked whether he knew that Hispanics live in the Green Oaks area, Trustee LaPato responded that he has "no idea who lives in that area." LaPato Dep. at 107. Trustee Veenstra testified that he "was not aware of any type of ethnic makeup of those [Green Oaks and Michael Lane] areas." Veenstra Dep. at 105. Trustee Layne said she did not know whether some parts of Addison have more Hispanics than others. Layne Dep. at 22–24, 36–37. According to Trustee Theodore, the Board did not discuss the ethnic composition of Green Oaks either at the time the Army Trail/Mill Road TIF was adopted or for several weeks afterward, and he was not aware of any majority Hispanic area in the Village. Theodore Dep. at

---

5. The parties also adduced evidence relating to criminal activity, and parking and flooding problems in Green Oaks and Michael Lane. It is unnecessary for this Court to recount this evidence, however, because it does not add to or subtract anything from our determination about the strength of the plaintiffs' case. Suffice it to say that the evidence conflicts, and is less pertinent to the issue of blight than the evidence discussed above.

79–80. Both Trustees Hartwig and Chrysogelos testified that the Board never discussed or considered the percentage of Hispanics in Michael Lane and Green Oaks in adopting the TIFs. Although Chrysogelos admitted that he knew that Green Oaks is approximately 50% Hispanic, Hartwig said he did not find out that the two neighborhoods are 50% Hispanic until after plaintiffs filed suit. Chrysogelos Dep. at 4, 66–70; Hartwig Dep. at 17, 59–63.

The Trustees testified to much greater familiarity with other conditions in these neighborhoods. Veenstra explained that in Green Oaks, "[o]pen, green area and additional parking were amenities that were necessary and would be appropriate for that area." Veenstra Dep. at 121. Chrysogelos stated that the Board decided to acquire buildings in the center core of the neighborhood because of "[t]he problems that had been in the general area, in other words, the density, the police reports, the problems of parking either on one side or both sides of the street." Chrysogelos Dep. at 31. Layne concurred that the Village wanted to "create green space, to lower the density, to try to improve parking and to eliminate flooding" in Green Oaks. Layne Dep. at 98. LaPato testified that Green Oaks and Michael Lane suffered from high crime, overcrowding, and parking problems. LaPato Dep. at 66. And Hartwig observed in these areas greater problems with graffiti, crime, and unsightliness. Hartwig Dep. at 86.

Having reviewed both the contested and uncontested relevant facts surrounding this litigation, it is now appropriate to turn to the proposed resolution of this complex housing discrimination case.

## II. THE PROPOSED CONSENT DECREE

The best summary of the proposed settlement and the Decree is contained in the notice sent to all class members. This notice summarizes the proposed settlement as follows:

### A. Ban on Housing Discrimination by the Village of Addison

The Consent Decree forbids the Village of Addison ("Village"), and all of its officials and employees and others acting with them or on their behalf, from engaging in any of the following acts of housing discrimination: (1) denying or otherwise making dwellings unavailable to persons because of national origin; (2) discriminating on the basis of national origin in the terms, conditions, or privileges of the sale or rental of dwellings, or in the provision of facilities and services in connection with the sale or rental of dwellings; (3) making statements with respect to the sale or rental of dwellings that indicate a preference, limitation, or discrimination on the basis of national origin; and (4) falsely representing to any person, because of national origin that any dwelling is not available for inspection, sale or rental.

### B. Redevelopment Plan

The Consent Decree provides for a redevelopment plan for the Green Oaks and Michael Lane neighborhoods and two nearby areas which: (1) preserves in excess of 75% of the existing housing in the two neighborhoods; and (2) provides for limited and phased acquisition and demolition of certain buildings in order to develop new public parks in both neighborhoods, the construction of new affordable housing in and/or near both neighborhoods, and the acquisition of a building for a new community resource center in the Michael Lane neighborhood. The Village may not use its TIF district powers in Green Oaks, Michael Lane or the two nearby areas designated in the redevelopment plan for the construction of affordable condominiums, except in accordance with the plan. The Consent Decree does not affect the rights of property owners or private developers to engage in sales, redevelopment or other private activities which do not involve the use of TIF powers or municipal benefits.

1. *Redevelopment of the Green Oaks neighborhood:* The Consent Decree provides that the Village of Addison may develop a public park with playground facilities and, at its option, additional parking in the center section of Green Oaks as follows. Initially, the Village: (1) may re-

move the two boarded-up buildings which it currently owns at 539 and 548 Green Oaks Ct., and (2) the Village, the plaintiffs and the United States will work to encourage the development of 24–28 affordable, condominium units on the approximately 1.4 acres of vacant land located east of the parking lot behind the Addison Presbyterian Church, north of Addison Trail Road, west of the Chateau Mill Condominiums and south of Stevens Drive (referred to in the proposed Consent Decree and in this Notice as "the Commonwealth Edison property"). The Village will not acquire or remove any further buildings in Green Oaks until it has a written commitment, approved by the Village for the development of the condominiums on the Commonwealth Edison property.

The boarded-up building which the Village owns on the outer "ring" at 431 Green Oaks Court will be offered for sale at its then current appraised value to (1) any resident owners who will be displaced by the development of the park in the center of Green Oaks (as an "exchange building" as described in section C.4. below), (2) its original owners, (3) any owner of a building which the Village has acquired or will acquire in the center of Green Oaks, or (4) anyone else, in that order of priority. If none of the current resident owners of buildings in the center of Green Oaks wishes to acquire 431 Green Oaks Ct., and it is not purchased within seven months thereafter, the Village may demolish it.

As of the time of the filing of this lawsuit, in October, 1994, the Village had entered into a contract to purchase the property on the outer "ring" at 529 Green Oaks Ct., which was never completed. At the option of the owner of that property, the Village will either rescind the contract and reimburse the owner's reasonable, direct expenses, or purchase the property and offer it as an exchange building to resident owners who are displaced from the center of Green Oaks.

2. *Redevelopment of the Michael Lane neighborhood:* Before it may undertake any other redevelopment of the Michael Lane neighborhood, the Village must develop a new public park and acquire a building for a community center in the neighborhood. In order to do so and to extend Rozanne Drive south to connect it with Elizabeth Drive, it must acquire (1) the northern part of the vacant land east of the Value Center Shopping Center and north of Lake Street, as well as (2) the 4–unit apartment buildings located at 189, 193 and 199 Michael Lane.

Once the park is developed and open to the public, the Village may proceed with any of the following redevelopment of the Michael Lane neighborhood, providing that at no time shall the Village cause or use its TIF powers to assist redevelopment which results in a decrease of the number of residential units in that neighborhood. Green Oaks, the Commonwealth Edison property, and the area for the new 16–24 unit condominium development described below [sic] to decrease by more than 92 units below the 827 which existed in March 1994, prior to the demolitions in Green Oaks. However, after the Consent Decree has been in effect for two years, any of the total of 17 units in the five apartment buildings in the far west end of the Michael Lane TIF district located at 416, 422, 426, 430, and 434 Lake Street which may become unusable as residences by operation of the Village's current Zoning Ordinance will not be counted as part of the 92 units.

The Village may acquire and remove on the east side of Addison Road the five 5–unit apartment buildings located at 441, 451, 461, 471 and 481 N. Addison Road for the development of 16 affordable town homes at that location.

The Village may acquire and remove between the east side of Valerie Lane and the west side of Addison Road, the two 12–unit buildings located at 545 and 555 N. Valerie Lane and the 6–unit apartment building located at 569 N. Valerie Lane for the development of 7 to 10 affordable duplexes at that location.

The Village may acquire and remove the 14–unit apartment building located at 523 N. Neva Ave., the 5–unit apartment building located at 434 Lake Street, and the

four 3–unit apartment buildings located at 416, 422, 426 and 430 Lake Street.

The Village may not acquire or remove any further residential buildings in the Michael Lane neighborhood unless it has received a written commitment from a developer, approved by the Village, to develop a 16–24 unit condominium development at the site which is located in the area currently paved and fenced west of the Alta Villa banquet hall, north of the Jewel Foods shopping center and south of Green Meadows Drive. However, if after six years, good faith efforts by the Village fail to result in a developer for that site, the Village may site the condominium development at an alternative location either (1) within Michael Lane, Green Oaks or the Commonwealth Edison property, as agreed to by the parties, or (2) elsewhere at its discretion.

Upon receipt and approval of the written commitment for the 16–24 unit condominium development and after a period of 6 years from the date of the entry of the Consent Decree, the Village may acquire and remove up to two more residential buildings in the Michael Lane TIF district containing a total of no more than 8 units for the purpose of creating additional parking spaces in the area. The Village may acquire the following buildings involuntarily by use of its eminent power, if necessary: 32 Elizabeth Drive (4–units), or 578 or 586 Rozanne Drive (3 units each).

As of the time of the filing of this lawsuit, in October, 1994, the Village had entered into contracts to purchase four buildings on the south side of Michael Lane at 47, 59, 193 and 199 Michael Lane. As stated above, the Village may acquire 193 and 199 Michael Lane for the park provided for in the Consent Decree redevelopment plan. At the option of the owners of 47 and 59 Michael Lane, the Village will either rescind the contracts to purchase those properties and reimburse the owners' reasonable, direct expenses, or purchase the properties and offer them as exchange buildings to resident owners who are displaced from the center of Green Oaks.

3. *Construction of New Affordable Housing:* The Village, with the assistance of the plaintiffs, the United States Department of Justice and, to the extent possible, any developers of the replacement housing to be constructed under the terms of the Consent Decree, shall make all reasonable efforts to obtain financial assistance or subsidies to decrease the purchase price and/or the mortgage rates of this new housing to make them as affordable as possible to residents of the Green Oaks and Michael Lane neighborhoods. In any event, the base price of the units in the two condominium developments and the town homes shall be no more than $125,000, and no more than $225,000 for each duplex. The housing may be developed in any combination by the Village, by private developers, or by others, but the Village shall be under no obligation to finance the construction. The Village will encourage and facilitate a mix of one to three bedroom units in each development of new housing. If any of the new housing is developed in part with the use of any Village powers or benefits, including but not limited to acquisition or demolition by the Village, the following persons shall be given a first opportunity to own or reside in that housing in the indicated order of priorities: (1) owners and residents displaced from 431, 519, 520, 523, 527, 531, 532, 539, 543, 547 or 548 Green Oaks Court by the Village's actions in 1994 prior to October; (2) owners and residents who are displaced from Green Oaks as a result of the implementation of the redevelopment plan in the Consent Decree; and (3) owners and residents who are displaced from the Michael Lane neighborhood as a result of the implementation of the redevelopment plan in the Consent Decree.

**C.  *Monetary And Other Compensation***

1. *Former owners of buildings in Green Oaks Court which were acquired by the Village in 1994:* The former owners of the eleven buildings located at 431, 519, 520, 523, 527, 531, 532, 539, 543, 547 and 548 Green Oaks Ct. shall receive an additional twelve percent (12%) of the purchase price paid to them by the Village when it

acquired those buildings in 1994. In addition, any of those owners who believes that exceptional circumstances exist which support the payment of additional compensation for their inconvenience, their financial losses or other injuries may, within 28 days of their receipt of written notification of the approval of the Consent Decree by the Court (not this Notice), submit a written request to the Village with any supporting documentation for receipt of up to an additional two percent (2%) of the 1994 purchase price. If the Village does not agree to the request for additional compensation, the final determination will be made by an officer appointed by the Court. The written notice of approval of the Consent Decree will specify how to request this additional compensation.

2. *Residents displaced from the buildings in Green Oaks which were acquired by the Village in 1994:* The residents of the 44 households who were displaced as a result of the Village's acquisition in 1994 of the eleven buildings in Green Oaks shall receive the greater amount of either (1) $7,000 per household, or (2) $5,000 plus an amount equal to the last three months paid in rent prior to the displacement from the Green Oaks residence. In the case of resident owners, this amount shall be paid in addition to the compensation described in the preceding paragraph, but persons in these households may otherwise make no additional claim for compensation pursuant to the Consent Decree.

3. *Owners of buildings acquired by the Village pursuant to the Consent Decree:* In furtherance of the redevelopment plan provided for in the Consent Decree, the Village may acquire certain buildings which are identified above. the Village must first seek a voluntary sale of any of these properties which it decides to acquire, by engaging in negotiations with the owner for a period of at least 60 days. If no agreement is reached, the owner shall have the right to receive from the Village an amount equal to one hundred and ten percent (110%) of the appraised fair market value at the time of acquisition. The appraisals will be done by certified real estate appraisers selected in random order from a list prepared by the plaintiffs and the Village. If the appraiser selected is not one previously agreed to by the plaintiffs, and an owner is dissatisfied with the appraisal, the owner may request a second appraiser from the list to do another appraisal, and the average of the two appraised values will be considered to be the fair market value of the property. The Village will pay for the first appraisal, but will only pay for the second appraisal if it is higher than the first. If the owner does not agree to sell the property, the Village may institute eminent domain proceedings to take the property for fair market value.

In addition, any owner who believes that exceptional circumstances exist which support the payment of additional compensation for their inconvenience, their financial losses or other injuries may, within 14 days of their receipt of written offer by the Village to purchase their property for 110% of appraised fee or market value, submit a written request to the Village with any supporting documentation for receipt of up to an additional two percent (2%) of the 1994 purchase price. If the Village does not agree to the request for additional compensation, the final determination will be made by an officer appointed by the Court. The Consent Decree contains, and the offer to purchase will specify, the details as to how to request this additional compensation.

4. *Exchange buildings for resident owners of buildings in Green Oaks Court acquired by the Village pursuant to the Consent Decree:* Four of the buildings which the Village may acquire pursuant to the redevelopment plan in the Consent Decree have owners who are also residents of the buildings: 524, 535, 540 and 544 Green Oaks Court. If the Village decides to acquire any of these buildings in addition to the rights to compensation described in the preceding and following paragraphs, the owners have the option to receive some or all of the compensation for the loss of their building in the form of a comparable exchange building of the same number of units in either the Green Oaks or the Michael Lane neighborhoods. If

the appraised fair market value of the exchange building is less than one hundred and ten percent 110% of the fair market value of the resident owner's building, the resident owner shall receive the exchange building plus the difference in values. If the exchange building is of greater value, the resident owner shall pay the difference to the Village and receive the exchange building as full compensation for the loss of the other building. At the owner's option, the exchange building may be transferred either in a condition which is certified as fully compliant with the Village codes or in "as is" condition, with the market value adjusted accordingly. The Village will pay the costs of appraisal, title, survey and recording incurred in an exchange of buildings. The exchange building must be available for acquisition and occupancy at the time the original building must be vacated.

5. *Residents displaced from the buildings in Green Oaks Court acquired by the Village pursuant to the Consent Decree:* The Village may acquire the remaining buildings in the center of Green Oaks Court pursuant to the redevelopment plan in the Consent Decree. The residents of households displaced as a result of the Village's acquisition of any of these buildings in Green Oaks Court shall receive the greater amount of either (1) $3,000 per household, or (2) $1,000 plus an amount equal to the last three months paid in rent prior to the displacement. In the case of resident owners, this amount shall be paid in addition to the compensation described in the preceding two paragraphs. In the case of persons receiving compensation as a result of displacement from Green Oaks Court residences in 1994, the additional compensation for displacement pursuant to the redevelopment plan in the Consent Decree will be the greater of the last three months rent or $2,000.

6. *The organizational plaintiffs:* Three of the named plaintiffs in the lawsuit are organizations: Hispanics United of DuPage County, the Hispanic Council, and the Leadership Council for Metropolitan Open Communities. These three organizations will be paid by the Village a total sum

of sixty thousand dollars ($60,000) to be distributed among them at their discretion.

7. *Other claimants:* A fund of $100,000 will be established to satisfy the claims of those named plaintiffs and members of the plaintiff class other than residents displaced from the buildings acquired by the Village in 1994 who have claimed damages against the Village other than for loss of a building or displacement from their residence. Those claims will be evaluated by one attorney representing the plaintiffs and one attorney representing the Village. Each claimant will have the option of accepting the amount recommended by the two attorneys. If the amount is not accepted by the claimant or the attorneys cannot agree on the amount, the claims will be resolved by the United States Magistrate Judge assigned to this lawsuit. If the Consent Decree is approved, claimants will be notified in writing as to the specific procedure for resolving their claims.

### D. *Relocation Assistance*

In addition to the compensation described above, the Village will establish a Housing Assistance Program to assist persons (1) who will be displaced as a result of the implementation of the redevelopment plan in the Consent Decree or (2) who were displaced from the Green Oaks or Michael Lane neighborhoods before the entry of the Consent Decree. Information and assistance will be provided in both English and Spanish. Each displaced household will be offered by the Village a choice of two alternative residences. Each residence shall, at the displaced household's option: have at least the same number of bedrooms and ninety-five percent (95%) of the floor space; rent for no more than one hundred and five percent (105%) of the monthly rent of the residence from which the household was or will be displaced; be in Addison, east of the I–355 Tollway and within 1.5 miles of the prior apartment; and be handicap accessible if required by the displaced household. If the displaced household has school age children, at least one of the alternatives will be in the same school attendance zone.

The Village will provide transportation or pay transportation costs for the displaced households to view the alternative residences.

### E. *Fair Housing Education*

Certain Village officials and employees will be required to receive at least four hours of training in the terms of the Consent Decree, the Fair Housing Act, and state and local laws forbidding housing discrimination.

The Village will deposit $30,000 in an interest bearing account to be used to fund programs to increase knowledge of the requirements of nondiscrimination in housing in Addison. Interested groups may submit proposals to the Village for consideration of receipt of funding, which will be determined by the Village in consultation with the United States Justice Department.

The monies expended under the Consent Decree as approved by the Court and the parties will be reimbursed through Tax Increment Finance proceeds and insurance proceeds and not general tax monies of the Village.

### F. *Time Period and Enforcement of Consent Decree*

Those parts of the Consent Decree which apply to development and redevelopment activities will remain in effect for the life of the two TIF districts, and the remaining parts will remain in effect for seven years. However, the Consent Decree may be modified by the Court upon a showing of good cause to do so. The Court will dismiss the Consent Decree and this lawsuit upon a certification by the Village that it will not use its TIF powers to acquire or remove any further properties in the Green Oaks or Michael Lane neighborhoods unless the private plaintiffs or the United States can establish good cause why it should not be dismissed.

The terms of the Consent Decree may be enforced by the Court upon a request by anybody affected by those terms or their violation.

The Decree also provided plaintiffs with total attorneys' fees and costs of $2.5 million.

With the relevant facts surrounding the litigation and the proposed settlement in mind, the Court will next review the standards for judicial approval of class action settlements and apply these standards to the proposed settlement.

### III. *THE STANDARDS FOR JUDICIAL APPROVAL OF CLASS ACTION SETTLEMENTS*

Rule 23(e) of the Federal Rules of Civil Procedure provides that "[a] class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." Fed.R.Civ.P. 12(e). In general, courts look upon the settlement of lawsuits with favor because it promotes the interests of litigants by saving them the expense and uncertainties of trial, as well as the interests of the judicial system by making it unnecessary to devote public resources to disputes that the parties themselves can resolve with a mutually agreeable outcome. *Newman v. Stein,* 464 F.2d 689 (2d Cir.1972). Compromise is particularly appropriate in complex class actions. *Armstrong v. Board of School Directors,* 616 F.2d 305, 312–13 (7th Cir.1980) ("In the class action context in particular, there is an overriding public interest in favor of settlement.") (internal quotations omitted); *In re Warner Communications Sec. Litig.,* 618 F.Supp. 735, 740 (S.D.N.Y.1985), *aff'd,* 798 F.2d 35 (2d Cir.1986) ("In deciding whether to approve this [class action] settlement proposal, the court starts from the familiar axiom that a bad settlement is almost always better than a good trial.... There is little doubt that the law favors settlements, particularly of class action suits.") (citations omitted).

In evaluating whether to give final approval to a proposed class action settlement, this Court essentially must determine whether the compromise, taken as a whole, is fair, reasonable and adequate. *Isby v. Bayh,* 75 F.3d 1191, 1196 (7th Cir.1996). The Court's inspection of a proposed settlement entails "a careful inquiry into the fairness of

the settlement to the class members before allowing it to go into effect." *Mars Steel Corp. v. Continental Ill. Nat. Bank & Trust Co.*, 834 F.2d 677, 682 (7th Cir.1987). In determining whether a settlement, taken as a whole, is fair, reasonable and adequate to all concerned, courts consider a variety of factors, including: (1) the strength of plaintiff's case on the merits, balanced against the amount offered in settlement; (2) the defendant's ability to pay; (3) the complexity, expense and likely duration of further litigation; (4) the amount of opposition to the settlement; (5) the presence of collusion in reaching a settlement;[6] (6) the reaction of members of the class to the settlement; (7) the opinion of competent counsel; (8) the stage of the proceedings and the amount of discovery completed; and (9) the public interest. *Armstrong*, 616 F.2d at 314 (citing *Manual for Complex Litigation* 56 (1977) and 3B *Moore's Federal Practice* ¶ 23.80(4), at 23–521 (2d ed.1978)); *see EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir.1985); *see also In re General Motors Corp. Pick–Up Truck Fuel Tank Prod. Liability Litig.*, 55 F.3d 768, 785 (3d Cir.1995) (highlighting nine-factor test to establish whether settlement is fair, reasonable, and adequate), *cert. denied*, 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995). We next consider these factors as applied to the Decree.

### A. The Strength of Plaintiffs' Case

#### 1. Legal Standards Applicable to Fair Housing Act Claims

Plaintiffs pursued their Fair Housing Act claim under two theories: disparate treatment, (i.e., intentional discrimination) and disparate impact. Pending at the time of settlement was plaintiffs' motion for summary judgment on their disparate impact claim, which alleged that the Village's TIF activities "have had and will have a significantly greater adverse impact on Hispanics than on non-Hispanics and will harm the Village of Addison generally by the creation and perpetuation of segregation." Am. Compl. ¶ 83. Plaintiffs argued that the Village not only targeted its largest Hispanic neighborhoods for inclusion in the districts, but also limited acquisition and demolition within the TIF districts to those neighborhoods. In Count II of their amended complaint, plaintiffs asserted that these same actions by the Village constituted intentional discrimination.[7]

The Fair Housing Act, commonly referred to as Title VIII, was passed "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. To that end, the Act makes it unlawful to

> refuse to negotiate for the sale or rental of, or to otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

*Id.* § 3604(a). Specifically, the statute was intended to promote " 'open, integrated residential housing patterns and to prevent the increase of segregation, in ghettos, of racial groups whose lack of opportunities the Act was designed to combat.' " *Metropolitan Housing Devel. Corp. v. Village of Arlington Heights (Arlington Heights II)*, 558 F.2d 1283, 1289 (7th Cir.1977) (quoting *Otero v. New York City Housing Auth.*, 484 F.2d 1122, 1134 (2d Cir.1973)). To fulfill this aim, courts are to apply the FHA's terms liberally: "It has long been recognized that to give full measure to the Congressional purpose behind the FHA, courts have given broad interpretation to the statute." *Snyder v. Barry Realty, Inc.*, 953 F.Supp. 217, 219 (N.D.Ill.1996) (citations and internal quotations omitted); *see also Arlington Heights*

---

**6.** *See also In re Warner Communications Sec. Litigation*, 798 F.2d 35, 37 (2d Cir.1986). Attention must be paid to the negotiating process that resulted in the proposed settlement. *Weinberger*, 698 F.2d at 74. The settlement must be the result of arm's length negotiations, and plaintiffs' counsel must be experienced and have engaged in adequate discovery necessary to represent the class effectively. *Id.* A strong initial presumption of fairness attaches to the proposed settlement

when it is shown to be the result of this type of a negotiating process. *Ross v. A.H. Robins Co.*, 700 F.Supp. 682, 683 (S.D.N.Y.1988).

**7.** We limit our discussion to the strength of the plaintiffs' case on discriminatory effect, the only claim briefed on summary judgment and ready for our consideration on the merits.

*II*, 558 F.2d at 1289 (citing cases that "have responded to the congressional statement of policy by holding that the Act must be interpreted broadly").

The leading Seventh Circuit case on Title VIII disparate impact claims against municipal defendants is *Arlington Heights II*.[8] *See Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1533 (7th Cir.1990). The *Arlington Heights* litigation revolved around the Village of Arlington Heights' refusal to rezone certain property within its corporate boundaries to permit construction of federally subsidized low-cost housing, with the result that low-income families, who were predominantly black, were excluded from the nearly all-white Village.[9] In remanding the case for a decision on whether plaintiffs had established a Title VIII violation, the court clarified the legal standards governing disparate impact claims under the Fair Housing Act. First, the court held that, "at least under some circumstances," a plaintiff can prevail without proving intent to discriminate.[10] *Id.* at 1290. In making this point, the court relied heavily on parallel Title VII jurisprudence, most notably, the Supreme Court's decision in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).[11] *See Arlington Heights II*, 558 F.2d at 1289. It explained that whether a particular case warrants relief under Title VIII in the absence of intent is a matter committed to the court's discretion, based on assessing the facts before it. *Id.*

Second, the *Arlington Heights II* court laid out four "critical factors" to guide this discretion: 1) the strength of plaintiff's discriminatory effect showing; 2) some evidence of discriminatory intent, even though short of satisfying constitutional standards; 3) the defendant's interest in taking the action at issue; and 4) the relief requested—does it require the defendant to construct housing or simply restrain interference with those who wish to provide it? *Id.* at 1290. All the factors are considered together and weighed against each other in a balancing process. *See id.* at 1290–94. Close cases are decided in favor of integrated housing. *Id.* at 1294. Since *Arlington Heights II*, the Seventh Circuit has used this four-factor test to affirm a grant of summary judgment for defendants, *see Gomez v. Chody*, 867 F.2d 395 (7th Cir. 1989), and has reaffirmed its continuing vitality as recently as 1995, *see Knapp v. Eagle Property Mgmt. Corp.*, 54 F.3d 1272, 1280 (7th Cir.1995). Because a disparate impact claim requires only some evidence of discriminatory intent, as opposed the preponderant proof needed to win an intentional discrimination case, plaintiffs' easiest route to victory would have been their disparate impact claim.

Yet applying the *Arlington Heights* disparate impact analysis in this case would have meant confronting several legal uncertainties. First, it is not clear whether the test sets the requirements for a prima facie case, or whether its components are to be considered in a final determination on the merits. *Compare Snyder v. Barry Realty Inc.*, 953 F.Supp. 217, 220 (N.D.Ill.1996) (analyzing *Arlington Heights II* factors as part of a prima facie case) *with Huntington Branch NAACP v. Town of Huntington*, 844 F.2d 926, 935 (2d Cir.) (stating that *Arlington Heights II* factors constitute standard for

---

**8.** The Supreme Court has yet to address a Title VIII case on the merits.

**9.** The court did not definitively resolve whether the zoning policy had a segregative effect. It remanded on the issue of whether the Village possessed alternative lots that would comply with federal guidelines on subsidized housing. The burden of proving this was placed on the defendant. *Id.* 558 F.2d at 1291, 1295 & n. 16.

**10.** Every circuit court faced with the issue has agreed that a plaintiff may win a Title VIII disparate impact case without having to prove intent to discriminate. *See, e.g., Pfaff v. U.S. Dept. of HUD*, 88 F.3d 739, 745–46 (9th Cir.1996); *Mountain Side Mobile Estates v. Secretary of*

HUD, 56 F.3d 1243, 1251–52 (10th Cir.1995); *Keith v. Volpe*, 858 F.2d 467, 483–84 (9th Cir. 1988); *Huntington Branch NAACP v. Town of Huntington*, 844 F.2d 926, 934–37 (2d Cir.), *aff'd per curiam*, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988); *Smith v. Town of Clarkton*, 682 F.2d 1055, 1065 (4th Cir.1982); *United States v. City of Black Jack*, 508 F.2d 1179, 1184–85 (8th Cir.1974); *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 146–49 (3d Cir.1977).

**11.** In *Griggs*, the Supreme Court held that conditioning employment for certain jobs on a high school diploma and satisfactory performance on an intelligence test violated Title VII because it produced a disparate impact on blacks.

final determination on the merits), *aff'd per curiam*, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988). Second, having borrowed disparate impact analysis from Title VII cases, does the test incorporate Title VII's burden-shifting mechanism discussed in *Griggs v. Duke Power Co.*, and if so, using what standards of proof? Third, exactly what must the plaintiff show to satisfy the "strength of the discriminatory effects" prong? Not surprisingly, the parties diverged widely on these issues, as well as on the larger question of how the *Arlington Heights II* factors applied here. We examine these arguments below.

### 2. The Parties' Arguments on Discriminatory Impact

Both parties molded their evidence to the *Arlington Heights II* four-factor test. Plaintiffs contended that the Village violated the Fair Housing Act's provisions because the Village "made unavailable" housing to its Hispanic residents by acquiring and demolishing their homes. In particular, the plaintiffs asserted that this course of TIF-driven acquisition and demolition in the Village's largest Hispanic neighborhoods had a discriminatory effect on Hispanics: 44% of the Village's Hispanic population lives in the TIFs, in contrast to the predominantly white surrounding areas, and the TIF districts are 49% Hispanic, while the Village-wide Hispanic population is just 13.4%. Other Village decisions, such as its failure to provide relocation assistance or send Spanish-language notices alerting residents of the impending upheaval, allegedly exacerbated the discriminatory effect. As evidence supporting the second factor—intent—plaintiffs offered the TIF boundaries themselves, as well as the Trustees' testimony professing ignorance of the TIFs' racial composition, which they claimed was implausible in light of evidence that the Trustees were aware of the TIF demographics early on and other testimony suggesting that areas' racial composition was difficult to ignore. Plaintiffs pointed also to

failed promises of public input and reassurances that the Village did not want to use its condemnation powers, as well as the rapid move to acquire and demolish apartments in the absence of a concrete redevelopment plan.

With respect to the third factor, defendant's reasons, the plaintiffs did not take issue with the general need for redevelopment in Green Oaks and Michael Lane. What they objected to was the Village's aggressive manner of redevelopment, which, plaintiffs claimed, was wholly unjustified given that these were habitable buildings—buildings that had a lengthy future economic life, were increasing in sales value, were licensed yearly as in compliance with the Housing Code, and were no more densely situated than the average multi-family rental structures in Addison. Under these conditions, plaintiffs claimed, a wealth of less discriminatory alternatives beckoned. Finally, addressing the fourth factor, plaintiffs characterized the nature of their requested relief as negative, not affirmative. They requested that the Village be enjoined from demolishing additional housing and ordered to restore the neighborhoods to the status quo.

The Village, on the other hand, asserted that plaintiffs' prior request for summary judgment on disparate impact is unprecedented in this Circuit and, in any event, unwarranted given the innumerable issues of fact.[12] First, the Village took issue with the plaintiffs' test for discriminatory effect. It submitted that the proper comparison is not between the percentage of Hispanics in the TIFs and in the whole Village, but rather between the percentage of Hispanics adversely affected, i.e., displaced, and those living in high-crime, poorly planned and deteriorating areas, i.e., the TIFs. Since these populations are nearly identical—each about 50% Hispanic—the Village strongly asserted that there was no discriminatory effect. The Village also claimed that the TIF boundaries were supported by valid planning concerns.

---

12. It is true that there are no decisions in this Circuit granting summary judgment to a plaintiff on a disparate impact claim. However, such motions have been brought, *see, e.g, Snyder v. Barry Realty Inc.*, 953 F.Supp. 217 (N.D.Ill.1996) (housing discrimination); *Council 31, AFSCME,*

*AFL–CIO v. Ward*, 1995 WL 109336 (N.D.Ill. Mar.10, 1995) (employment discrimination), and, in other Circuits, have succeeded, *see Oxford House, Inc. v. Town of Babylon*, 819 F.Supp. 1179 (E.D.N.Y.1993).

Furthermore, the Village consistently emphasized that since the Trustees denied discriminatory intent, this issue could be decided only by a jury after a long and difficult trial.

In support of the third *Arlington Heights* factor, the Village maintained that it had valid reasons for proceeding as it did. It claimed that housing code violations, deterioration, and lack of owner maintenance persisted in Green Oaks and Michael Lane, despite the Village's earlier efforts to arrest decline by implementing the less invasive alternatives posed in the Camiros study. Although the Village contended that it should not carry the burden of justifying its reasons and emphasized that its interests and methods command deference, it asserted that its proof on this point satisfied even the most demanding standards. Lastly, the Village claimed that the plaintiffs were asking the Court to order it to build affordable housing, establish a human rights commission, and pass a fair housing ordinance—which was all affirmative, drastic relief, traditionally disfavored.

### 3. Applying the *Arlington Heights II* Factors

We agree with the parties that our disparate impact analysis would have proceeded according to the *Arlington Heights II* four-factor test. As an initial matter, we must resolve whether the test merely constitutes the plaintiffs' prima facie case, which the defendant must then rebut with a nondiscriminatory reason, or whether it is a guide for the court's ultimate determination. Seventh Circuit precedent following *Arlington Heights II* demonstrates the latter—that the test is used to navigate to a conclusion on the merits. *Arlington Heights II*, for example,

was decided after a trial on the merits, appeal to the Seventh Circuit and Supreme Court, and remand from the Supreme Court. The Seventh Circuit in *Gomez v. Chody*, 867 F.2d 395 (7th Cir.1989), weighed the four factors to make a final decision affirming summary judgment. In neither opinion does the court make reference to the *Arlington Heights II* test as a prima facie case that requires rebuttal from the defendant after performing the four-factor analysis.[13]

Furthermore, the significant FHA disparate impact cases from two other Circuits and the policy underlying the FHA support our conclusion. The Second Circuit explained that

> factors such as those mentioned in *Arlington Heights II* are to be considered in a final determination on the merits rather than as a requirement for a prima facie case.... Nothing in *Arlington Heights II* indicates the court saw its test as anything but a final determination on the merits. Furthermore, treating the four factors as steps necessary to make out a prima facie case places too onerous a burden on [plaintiffs]. The legislative history of the Fair Housing Act argues persuasively against so daunting a prima facie standard.

*Huntington*, 844 F.2d at 935.

Likewise, the Third Circuit opined that *Arlington Heights II* "is setting forth a standard upon which ultimate Title VIII relief may be predicated, rather than indicating the point at which the evidentiary burden of justifying a discriminatory effect will shift to the defendant." *Rizzo*, 564 F.2d at 148 n. 32. We agree with these statements, and conclude that they are well-founded in Seventh Circuit precedent.[14] *See Cabrini–Green Lo-*

---

**13.** This is not to say that *Arlington Heights II* did not contemplate burden-shifting on any of the critical factors. We take that issue up later in the opinion.

**14.** In reaching this conclusion, we must respectfully disagree with our colleague's analysis in *Snyder v. Barry Realty, Inc.*, 953 F.Supp. 217 (N.D.Ill.1996). That decision, a case of familial status discrimination on cross-motions for summary judgment, used the *Arlington Heights II* factors only to determine whether the plaintiffs had established a prima facie case of disparate impact. *Id.* at 220. Finding that the plaintiffs

had made their prima facie case by producing evidence on each factor, the court went on to shift the burden to the defendant to articulate a non-discriminatory reason for its occupancy limits. *Id.* at 221. The defendant failed this burden, but because the plaintiffs did not show that a less restrictive practice would achieve the defendant's goals, both sides were denied summary judgment. *Id.* at 222–23. We are of the opinion that this analysis is redundant because it considers the defendants' reasons twice—once as part of the prima facie case and once to rebut the prima facie case. Moreover, the only authority

*cal Advisory Council v. Chicago Housing Auth.,* 1997 WL 31002, at *13 (N.D.Ill.1997) ("[T]he four-factor test set out in *Arlington Heights* ... is more properly applied to a motion for summary judgment or by the fact finder at trial."). We therefore proceed to evaluate the evidence relevant to each of the four *Arlington Heights* factors to determine the strength of this claim.

### (a.) Discriminatory Effect

A facially neutral policy or decision has a discriminatory effect if it "actually or predictably results in racial discrimination." *Keith v. Volpe,* 858 F.2d 467, 482 (9th Cir.1988) (quoting *United States v. Black Jack,* 508 F.2d 1179, 1184–85 (8th Cir.1974)); *Huntington,* 844 F.2d at 934 (citations omitted). FHA cases recognize that housing decisions can discriminate in two ways: by visiting a "greater adverse impact on one racial group than another," or by perpetuating segregation. *Arlington Heights II,* 558 F.2d at 1290; *see Huntington,* 844 F.2d at 937. In ascertaining whether an action has produced a discriminatory effect, courts have found Title VII jurisprudence instructive. *See Huntington,* 844 F.2d at 935 (pointing out the parallels between the two statutes and observing that "the two statutes require similar proof to establish a violation"); *see also Arlington Heights II,* 558 F.2d at 1288–89; *Smith,* 682 F.2d at 1055; *Rizzo,* 564 F.2d at 146–48. As in employment discrimination cases, discriminatory effect in fair housing cases can be illustrated with statistics. *Mountain Side Mobile Estates Partnership v. Secretary of HUD,* 56 F.3d 1243, 1251, 1253 (10th Cir. 1995) (focusing on local housing market and family statistics in familial status discrimination case); *Huntington,* 844 F.2d at 929 (considering statistics of town population and housing project population in refusal-to-rezone case); *Smith v. Town of Clarkton,* 682

F.2d at 1060–65 (4th Cir.1982) (looking to population statistics in neighboring towns in refusal-to-build case); *Rizzo,* 564 F.2d at 149 (analyzing town's changing racial composition in discriminatory refusal-to-build case). Local, not national, statistics are usually most pertinent, and the analysis "must involve the appropriate comparables." *Mountain Side,* 56 F.3d at 1253.

For example, in finding that Arlington Heights' adherence to zoning laws preventing construction of low-income multifamily housing produced a discriminatory effect on blacks, the *Arlington Heights II* court compared the percentage of blacks in the Chicago metropolitan area who were eligible for federally subsidized housing to their percentage of the area's total population. *Arlington Heights II,* 558 F.2d at 1287. While 40% of those eligible to receive federal assistance in the area were black, blacks constituted only 18% of the population. *Id.* Consequently, the Village's decision, which "effectively precluded the construction of low-cost housing on [the plaintiff-developers'] property, constituted a greater deprivation of housing opportunities for black people than for white people." *Id.* In other words, the Village's actions had a greater adverse impact on blacks than on whites. *Id.* at 1288. The court acknowledged that although 60% of the area's potential subsidized housing recipients were white, making the case for discrimination weaker than if nearly all of those eligible were black, this was "not by itself an obstacle to relief under the Fair Housing Act." *Id.* at 1291. The fact that the anticipated housing would likely have integrated an almost all-white Village raised the possibility that refusing to rezone the property perpetuated segregation, the second type of discriminatory impact. Lacking a complete record, the court left a final determination on discriminatory effect to the district court.[15]

cited in support of this formulation is a case that *Snyder* later finds inconsistent with Seventh Circuit precedent. *Id.* at 220, 222. Finally, we agree with the Second Circuit that turning *Arlington Heights II* into a prima facie case would place too great a burden on plaintiffs. The Court emphasizes that it does not object to burden-shifting within the four-factor test; we simply disagree with relegating the whole test to the prima facie

case and then adding on to the analysis, absent a Seventh Circuit endorsement.

**15.** The court remanded on this issue because the district court had not addressed the Village's contention that other available land parcels were suitable for this low-cost housing. *Id.* 558 F.2d at 1291. On remand, the Village had the burden of identifying such land and of proving its suitability. *Id.* at 1295. The majority disagreed with

■ Using the measuring stick provided by *Arlington Heights II*, we believe that the plaintiffs in this case could have demonstrated that the Village's TIF-related activities produced a discriminatory effect on its Hispanic residents. Over 49% of the TIF district residents are Hispanic, while their Village-wide population is just 13.4%. The districts also contain the two largest Hispanic neighborhoods—in fact the only two majority Hispanic areas—in the Village. Moreover, almost 44% of the Village's entire Hispanic population resides in these two districts. Given these facts, the way in which the Village fashioned the TIF districts had a greater impact on Hispanics than on whites because they were included disproportionately—at a rate almost four times their population in the Village as a whole. The statistical picture here is even more compelling than in Arlington Heights, both because it is more disproportionate (49% affected/13.4% population versus 40% affected/18% population), and more concrete: the *Arlington Heights* court had to assume that the demographics of the proposed housing project would mirror the percentage of blacks and whites eligible for subsidized housing; here we know the racial composition of the affected population because the TIFs are already in place.

And all indications were that, for Hispanics, the effect of being disproportionately included in the TIF districts was adverse. The Village began and ended (constrained by the stand-still agreement) an aggressive course of TIF-related acquisition and demolition in the majority Hispanic neighborhoods of Green Oaks and Michael Lane. Green Oaks was affected most dramatically, with 44 of its families displaced, and several more buildings slated to be demolished or condemned. Although only one-half of the displaced residents was Hispanic, 50% is still far out of proportion to a 13.4% Village-wide population. Further evidence of discriminatory effect is found in the fact that the Village began TIF activities in majority Hispanic areas, and never reached the vacant, deteriorating commercial sites or predominantly non-minority sectors in the districts. Simply because the buildings in Green Oaks may have been integrated does not change that fact that the Village embarked on a selective course of action focused on the largest Hispanic neighborhoods in Addison. Exacerbating the effect on Hispanics was the Village's failure to provide Spanish-language notices alerting Michael Lane or Green Oaks residents to the consequences of living in a TIF district, although the Village knew these were majority Hispanic areas and had sent bilingual announcements there in the past. Considered together, these facts could satisfy the first type of discriminatory effect, a greater adverse impact on one race than another.[16]

The Village attempted to dodge this evidence by claiming that plaintiffs had used the wrong "reference population" to show discriminatory effect. According to the Village, the plaintiffs should not have compared the

---

the concurring Judge Fairchild—who believed the plaintiffs should shoulder this burden—pointing out that this would force plaintiffs to "attempt the almost impossible task of proving a negative," that no other land in the Village would accommodate the anticipated housing. *Id.* at 1295 n. 16. If the Village failed its burden on remand, the court directed the district court to conclude that its zoning decision perpetuated segregation in the Village, and to grant the plaintiffs relief. *Id.* at 1295.

16. There is also some evidence that, if left unrestrained, the Village's activities could have had the secondary consequence of increasing segregation. Before 1994, Michael Lane and Green Oaks supplied nearly a quarter of the Village's rented housing, affordable to their majority low- and moderate-income residents. After passing the TIFs, the Village performed appraisals in 28 of the 35 buildings in Green Oaks, and, by the

time plaintiffs filed suit, had demolished eight, with three more awaiting demolition and nine pending in condemnation actions. In Michael Lane, the Village's density goal would have required demolishing 359 of neighborhood's 619 units. But the Village's TIF budgets did not provide for relocation assistance, nor was any offered in practice. With no Village plans to replace demolished buildings with affordable housing, and the low (2.7%) residential vacancy rates in the Village, the large numbers of financially strapped residents from Michael Lane and Green Oaks would find it difficult to secure housing within Village limits. Tracking the demographics of Green Oaks and Michael Lane residents, as well as of displaced persons, about 50% would be Hispanic. And because these neighborhoods contain 44% of the Village's Hispanic population, there loomed a danger of forcing large numbers of Hispanics to relocate outside the Village.

percentage of Hispanics in the TIF districts to those in the general Village population, but rather should have pit the percentage of Hispanics displaced by TIF redevelopment activities against those living in areas needing redevelopment. Conceding that *Arlington Heights II* employs the first method, derived from Title VII case law, the Village insisted that the test for discriminatory effect in Title VII cases has evolved since then. In *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), a discriminatory failure-to-hire-and-promote case, the Supreme Court defined the proper statistical comparison in disparate impact cases as between "the racial composition of the qualified persons in the labor market and the persons holding the at-issue jobs." *Id.* at 651, 109 S.Ct. at 2121–22. The Court reasoned that if the shortage of minorities in certain positions was the product not of discrimination, but due instead to the "dearth of qualified nonwhite applicants," the employer should not be held liable for employment discrimination. *Id.* at 651–52, 109 S.Ct. at 2121–22.

By analogy, the Village asserted the only "qualified persons" in this case are those residing in areas needing aggressive redevelopment, more specifically, areas in the Village "with high crime, deteriorating housing, and poor planning." Def. Br. at 21. According to the Village, the only regions in this category are the TIF districts themselves, because "they are in the worst condition in the Village" and plaintiffs did not prove that other areas were similarly situated. *Id.* Because both the TIFs and the persons displaced from them are about 50% Hispanic, and equal numbers of Hispanics and whites were affected, the Village strongly maintained the plaintiffs had not established any discriminatory effect.

However, the Court believes the Village's analogy to *Wards Cove* is flawed in several respects. First, the Village's interpretation of the "qualified persons" test is inconsistent with reference populations used in fair housing cases, which, unlike *Wards Cove*, are directly on point. Second, *Wards Cove's* precedential value has been considerably weakened by Congress' statutory overruling in the Civil Rights Act of 1991. Third, the Village's formulation is illogical because it

assumes the validity of its own justifications for adopting the TIFs, fusing the first and third *Arlington Heights II* factors in a manner entirely contrary to the court's analysis.

As part of their discriminatory effect calculations, Fair Housing Act cases have often looked at area-wide population statistics and compared them to statistics for the group adversely affected. In *Huntington Branch NAACP v. Town of Huntington*, a case hauntingly similar to *Arlington Heights II*, zoning laws limited construction of multifamily housing to the town's "urban renewal zone," which was 52% minority populated. 844 F.2d at 930. When plaintiffs petitioned for a change in the zoning laws to build an integrated, federally subsidized apartment complex in a nearly all-white neighborhood, and the town refused, they sued under Title VIII. *Id.* at 928. In finding that the town's "failure to rezone ... had a substantial adverse impact on minorities," the court observed that "minorities constitute a far greater percentage of those currently occupying subsidized rental projects compared to their percentage in the Town's population." *Id.* at 938. A similarly disproportionate percentage of blacks comprised the families holding subsidized housing certificates and on the waiting list to get certificates. *Id.* The court also premised its discriminatory effect determination on the fact that only 7% of all the town's families were in need of subsidized housing, while 24% of the town's black families needed such housing. *Id.*

Similarly, in *Smith v. Town of Clarkton*, the court found discriminatory effects produced by the town's decisions to withdraw from a county-wide housing authority and terminate construction of a low-income housing project. While blacks comprised under 40% of the county's population, 56% of all poverty-level families in the county were black, and 69.2% of all black families in the county were eligible for low-income housing. *Id.* at 1061. This "undisputed statistical picture [left] no doubt" that terminating the housing project affected blacks adversely. *Id.* at 1065.

The principle to be gleaned from these decisions is that using town-wide demographics for comparison to the affected population is a perfectly legitimate method of establish-

ing discriminatory effect. Neither of these courts limited the reference population based on some notion of "qualified persons." Instead, these courts used the statistics that were most relevant given the facts before them, and did not establish hard-and-fast rules about the appropriate reference population. Likewise, as discussed above, we find the Village-wide demographics very telling under the particular facts presented here. As the Supreme Court recognized, "Statistics ... come in infinite variety.... [T]heir usefulness depends on all of the surrounding facts and circumstances." *Hazelwood Sch. Dist. v. United States,* 433 U.S. 299, 312, 97 S.Ct. 2736, 2744, 53 L.Ed.2d 768 (1977) (internal quotations and citations omitted).

The Village cited only one FHA case, *Gomez v. Chody,* 867 F.2d 395 (7th Cir.1989), that purportedly rejects a city-wide reference population. A closer look at the case belies this interpretation. During the course of a renovation project, the private developer in *Gomez* demolished portions of an apartment building complex that was 95% Hispanic, but "in an advanced state of dangerous disrepair, unsanitary, and infested with insects and rodents." *Id.* at 397–98. The apartment complex had also been declared a public nuisance. *Id.* at 397. As part of his contract to rehabilitate the apartments, the developer agreed that at least 51% of the renovated apartments would be affordable to low- and moderate-income persons. *Id.* at 398. Because gutting and renovation required displacing all the apartment residents, the County adopted a plan to provide those displaced with relocation assistance. *Id.* The displaced Hispanic residents sued, alleging disparate impact under the FHA based on the fact that Hispanics constituted only 60% of the city's population, but comprised 95% of the building residents. *Id.* at 400. The court found no discriminatory effect, holding that the record conclusively established that, whatever the tenants' race or the demands of the rehabilitation project, the apartments "had to be closed because they were unfit for human habitation." *Id.* at 402. Consequently, " 'everyone living in the apartments would have to be displaced, regardless of their national origin....' " *Id.* (quoting the district court). The *Gomez* court understandably determined that statistics were irrelevant given

the building conditions; it did not, however, extend that holding to every fair housing case, especially those in which the need for aggressive redevelopment may be in serious question.

In conclusion, we find that, although the requisites for establishing discriminatory effect under the FHA are not crystal clear in every case, a careful analysis of the law and the evidence here reveals that the facts presented could have shown discriminatory effect under the established law in this Circuit.

**(b.) Evidence of Discriminatory Intent**

■ The second *Arlington Heights II* factor directs courts to ascertain whether the plaintiff has offered "some evidence" of discriminatory intent. *Arlington Heights II,* 558 F.2d at 1292. This is the least important of the four factors, *id.,* and the required showing under it is modest. The plaintiffs' evidence need only give "some indication— which might be suggestive rather than conclusive—of discriminatory intent." *Phillips v. Hunter Trails Community Ass'n,* 685 F.2d 184, 190 (7th Cir.1982).

On appeal from *Metropolitan Housing Devel. Corp. v. Village of Arlington Heights (Arlington Heights I),* 517 F.2d 409 (7th Cir.1975), the Supreme Court examined the issue of intent in relation to Equal Protection Clause violations. It recognized that an intent to discriminate must often be inferred from surrounding circumstances, and instructed courts on the kinds of circumstantial evidence that might be relevant:

> Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face.... But such cases are rare ... impact alone is not determinative, and the Court must look to other evidence....
>
> The specific sequence of events leading up to the challenged decision also may shed some light on the decision maker's purposes.... Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decision maker strongly favor a decision contrary to the one reached.

The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports. *Village of Arlington Heights v. Metropolitan Housing Devel. Corp.*, 429 U.S. 252, 266–68, 97 S.Ct. 555, 563–565, 50 L.Ed.2d 450 (1977). The Court explained that this list was illustrative, not exhaustive. *Id.* at 268, 97 S.Ct. at 565. We simply use it as a starting point in applying the "some evidence of intent" factor to the facts in this case. Using the Supreme Court's language as a guide, we find three categories of evidence that could have exhibited some evidence of discriminatory intent.

### (i.) TIF Boundaries and Activities

One consideration the Supreme Court found relevant to intent is the effect that a facially neutral state action has on a particular race. As discussed above, the contours of the TIF district boundaries themselves constitute dramatic evidence of racial targeting, given that they encompass 44% of the Village's Hispanic population, the two largest Hispanic neighborhoods in the Village (Green Oaks and Michael Lane), and include Hispanics disproportionately, at a rate almost four times their population in the Village. In contrast, all the areas bordering the TIFs are majority white. Furthermore, TIF-related acquisition and demolition occurred exclusively within Green Oaks and Michael Lane, leaving the majority white and commercial sections in the TIFs untouched. The evidence shows that the Village had no plans for TIF demolition outside these two neighborhoods. Although this impact evidence is not in and of itself determinative of intent, it could satisfy the "some evidence of intent" criterion.

### (ii.) Legislative History of and Events Surrounding Adoption of the Army Trail/Mill Road TIF

The events before and after the Village passed the Army Trail/Mill Road TIF revealed some further evidence of discriminatory intent. The undisputed evidence demonstrated that the Trustees were less than forthright with TIF district residents, moved rapidly to secure and demolish buildings in a neighborhood they knew was majority Hispanic, and failed to send Spanish-language notices or offer relocation assistance for those displaced. All this aggressive, focused redevelopment was undertaken without a developer or a specific redevelopment plan.

At the Army Trail/Mill Road public hearing, Trustee Hartwig assured concerned TIF residents that the Village wanted to do the least possible to accomplish its goals, and was reluctant to exercise its condemnation powers. He explained that the Trustees "wanted public input all along the way," and told residents that "all decisions have to be made at public hearings." Despite having given the impression that TIF redevelopment would proceed gingerly and after consulting the public, the Trustees authorized the Village Manager to begin acquiring buildings in Green Oaks just three weeks later, at an Executive Session meeting closed to the public. The Trustees' flippant remarks during the meeting displayed a disconcerting hunger for demolishing buildings in the neighborhood and a disregard for the consequences to Hispanics: Trustee Russotto wanted to "buy the center core first, we can buy and demolish more buildings this way"; Village Manager Block said he could "probably accomplish the purchase and demolition and get started now." When Trustee Chrysogelos inquired about displacing the Hispanic tenants who "total approximately 50% in the area," no one responded. By April, the Village had appraised 28 of the neighborhoods' 35 buildings. And in the following six months, the Village demolished eight buildings, prepared three more for demolition, filed condemnation actions against the owners of nine buildings, and contracted to buy two others. As a result, 44 families lost their homes. The public was not asked for input on the decisions to acquire and demolish property in Green Oaks. Instead, claiming they received "overwhelming" informal support, the Trustees proceeded to acquire and demolish buildings in one of the Village's largest Hispanic neighborhoods without a developer or specific redevelopment plan.[17]

---

**17.** A similar pattern appeared to be emerging in the Michael Lane TIF, which was adopted just before plaintiffs filed this suit. At the October 3, 1994 meeting where the TIF was passed, the

Meanwhile, the Army Trail shopping center, the structure over which TIF consultants Kane McKenna expressed the most concern about blight, remained undisturbed because no developer had committed to the project. The majority white apartment complexes to the south were also shielded from TIF activities.

### (iii.) Village Knowledge of Green Oaks and Michael Lane Demography

Finally, some evidence of discriminatory intent is manifested in the disparity between the Village's admissions, testimony from Village employees, and statements by residents on one hand, and the Trustees' testimony on the other. The admissions conclusively establish that the Trustees knew before adopting the TIFs that Green Oaks and Michael Lane were majority Hispanic neighborhoods, and, in particular, that Green Oaks contained one of the largest Hispanic populations in the Village.[18] But it is also undisputed that the Trustees testified that they either did not know or did not consider the ethnicity of these neighborhoods' residents when they passed the TIF ordinances.[19] In light of clear admissions to the contrary, it is astonishing how many Trustees professed ignorance about Green Oaks and Michael Lane's racial composition. Moreover, the Trustees testified in surprising detail about all the structural problems plaguing Green Oaks and Michael Lane, including poor building maintenance, density, lack of parking, crime, graffiti, and overcrowding. A rational jury could very well have concluded that such inconsistencies were evidence that the Trustees harbored discriminatory intent.

Village Manager presented contracts to purchase four buildings in Michael Lane. The Village's goal was to reduce density in the neighborhood to 8 to 10 units per acre, which would have necessitated demolishing 359 of Michael Lane's 619 units. Both the acquisitions and density reduction in Michael Lane were planned in the absence of a developer or a specific redevelopment scheme.

**18.** On March 15, 1996 and March 20, 1997, this Court ruled for the plaintiffs on a number of their requests to admit. The facts in the sentence preceding this footnote are among those deemed admitted by court order.

**19.** The undisputed evidence called into question the Trustees' claims that they were unaware of

While this evidence could have satisfied the "some evidence of intent" standard applicable to disparate impact claims, it is much less clear whether it would have been sufficient to prove an intentional discrimination claim. At best, this issue could have been decided only after a full trial on the merits, which would have been financially and emotionally devastating to both sides in this case. Still, for the "some evidence of intent" factor to weigh in the plaintiffs' favor on disparate impact, the Court does not have to reach an ultimate conclusion on intent. The facts need only provide "some indication—which might be suggestive rather than conclusive—of discriminatory intent." *Phillips,* 685 F.2d at 190. We find that the plaintiffs could have satisfied this second *Arlington Heights* factor.

### (c.) The Village's Interest in Taking the Actions Producing Discriminatory Effect

The Village's nondiscriminatory explanations are properly considered in connection with the third factor—defendant's interest in taking the actions at issue. The court in *Arlington Heights II* had this to say about the third component of its four-prong test:

> The third factor which we find to be important is the interest of the defendant in taking the action which produces a discriminatory impact.... [I]f the defendant is a governmental body acting outside the scope of its authority or abusing its power, it is not entitled to the deference which courts must pay to legitimate governmental action. On the other hand, if the defendant is a governmental body acting within

the large Hispanic presence in Green Oaks and Michael Lane. For one thing, it was "clear" and "obvious" to Kane McKenna's Vice President, Leslie Murphy. The Hispanic concentration in Michael Lane so struck another Kane McKenna employee after he drove through it that he wondered whether the Village was earmarking the area based on its racial makeup. In addition, Addison's police chief and two housing inspectors deposed by plaintiffs testified that they knew Michael Lane and Green Oaks were predominantly Hispanic. The bigoted remarks directed toward Hispanics during the Michael Lane TIF hearing reflect that Village residents had similar observations.

the ambit of a legitimately derived authority, we will less readily find that its action violates the Fair Housing Act.

558 F.2d at 1293. Turning to the facts before it, the court found that Arlington Heights was acting within the scope of its zoning authority under Illinois law when it refused to rezone a parcel of land in order to accommodate multi-family housing. *Id.* In light of this and the fact that municipalities have wide discretion in zoning matters, the court found that this factor weakened the plaintiffs' case. *Id.*

Similarly, the Village claimed that it was acting well within its authority under the TIF statute when it adopted the districts and began acquiring and demolishing buildings within them. It maintained that both its decisions to include Green Oaks and Michael Lane in the TIFs, as well as to acquire and demolish buildings in these areas, were well-supported by the deterioration, lack of owner maintenance, and density problems in the neighborhoods. Moreover, the Village argued, it attempted to implement the less drastic alternatives posed in the 1988 Camiros study, but was thwarted by the building owners' and residents' failure to cooperate. Under these circumstances, the Village claimed that TIF qualification, acquisition and condemnation were perfectly legitimate means of redevelopment.

Plaintiffs responded that they do not contest the need, in general, to redevelop Green Oaks and Michael Lane. It is the Village's unwarranted and aggressive course of pursuing redevelopment in these neighborhoods that the plaintiffs faulted. They pointed out that all the buildings in these areas were habitable, had future economic lives of at least 40 years, were licensed as compliant with the Housing Code in 1994, and were increasing in sales value. Plaintiffs claimed that density problems in these areas are belied by figures demonstrating that Green Oaks and Michael Lane contained no more units per acre than the average multi-family rental complex area. Finally, plaintiffs denied that they stymied any less discriminatory alternatives. According to them, it was the Village that refused to follow through. We analyze these arguments below, but first we must determine who bears the burden of proof on this issue.

#### (i.) Burden of Proof

Neither *Arlington Heights II* nor *Gomez v. Chody,* the two Seventh Circuit cases applying the *Arlington Heights II* factors to reach a decision on the merits, specifies which party has the burden on the defendant's interest factor. The issue arises because FHA disparate impact jurisprudence relies heavily on Title VII case law, which forces the employer to defend its interests by imposing on it the burden of proving business necessity to rebut a prima facie case of discriminatory effect. *See Griggs v. Duke Power Co.,* 401 U.S. 424, 431–33, 91 S.Ct. 849, 853–54, 28 L.Ed.2d 158 (1971). Indeed, the Seventh Circuit has recognized that the *Arlington Heights II* analysis "was in fact though not in words the 'disparate impact' analysis familiar from Title VII cases." *Village of Bellwood v. Dwivedi,* 895 F.2d 1521, 1533 (7th Cir.1990). The question is whether, along with the analysis, the *Arlington Heights II* court meant to adopt Title VII's burden-shifting mechanism. *Dwivedi,* as well as case law from other circuits, suggests that it did.

In *Dwivedi,* a real estate brokerage firm was accused of violating the FHA through racial steering—leading buyers to purchase homes in a manner that segregated the Village. While determining that disparate impact analysis was not appropriate under the facts before it, the court nevertheless paused to comment on *Arlington Heights II. Id.* at 1532. Opining that the Village in that case had not offered strong reasons for refusing to rezone a parcel of land to accommodate low-cost multifamily housing, the court suggested: "If, therefore, the refusal had a discriminatory impact, the failure to establish 'business necessity' could, by analogy to Title VII disparate impact cases, condemn the refusal notwithstanding the absence of proof, direct or indirect, of racial animus." *Id.* at 1533. The court went on, however, to question the correlation to Title VII "after the Supreme Court curtailed Title VII disparate impact liability in *Wards Cove v. Atonio.*" *Id. Wards Cove* was, of course, overruled by Congress in the Civil Rights Act of 1991, which codified *Griggs v. Duke Power Co.*'s holding that defendants bear the burden of

proving business necessity. Therefore, by drawing the analogy to Title VII jurisprudence and its business necessity requirement, *Dwivedi* leaves open the possibility that *Arlington Heights II* permits placing on defendants the burden of proving a business necessity in Title VIII cases.

Cases from three other circuits that have endorsed the *Arlington Heights II* analysis, either in whole or in part, shift to defendants the burden of proving some kind of justification for their actions. Each decision, however, defines the defendant's burden in a slightly different manner. In *Mountain Side Mobile Estates Partnership v. Secretary of Housing and Urban Devel.*, 56 F.3d 1243 (10th Cir.1995), plaintiffs sued the owner of a mobile home park for violating the FHA by adopting occupancy limitations that discriminated against families. The court reviewed the HUD's decision using three of the four *Arlington Heights II* factors, eliminating only the "some evidence of intent" prong. *Id.* at 1252. Addressing the defendant's interests factor, the court determined that "[o]nce plaintiffs establish a prima facie case of disparate impact, the burden shifts to the defendant to produce evidence of a 'genuine business need' for the challenged practice." *Id.* at 1254 (citing *Griggs*, 401 U.S. at 432, 91 S.Ct. at 854). Under the guidance of *Griggs*, as restored by the 1991 Civil Rights Act, the park owner was required to show that its discriminatory practice bears a "manifest relationship to the housing in question." *Id.* However, once the park satisfied this burden, it was up to the plaintiffs to show that other alternatives "without a similarly undesirable ... effect, would also serve the [defendant's] legitimate interest." *Id.* (internal quotations and citations omitted).

More to the point are FHA cases from the Second and Third Circuits involving municipal defendants. In *Resident Advisory Board v. Rizzo*, 564 F.2d 126 (3d Cir.1977), the court held that a town violated the FHA by withdrawing from a county-wide housing authority and terminating a project that would have integrated a segregated area. During its analysis, the court opined that the four *Arlington Heights II* "critical factors" set a "standard upon which ultimate Title VIII relief may be predicated, rather than indicating the point at which the evidentiary burden

of justifying a discriminatory effect will shift to the defendant." *Id.* at 148 n. 32. Taking on the task that *Arlington Heights II* left it, the court defined the defendant's burden of justifying actions that produce a discriminatory effect: first, the defendant must show that the justification serves "a legitimate, bona fide interest"; and second, the defendant must show that no alternative course of action with less discriminatory impact would have served this interest. *Id.* at 149. The court eschewed precise reliance on Title VII's business necessity test because it does not translate well to Title VIII cases—job requirements are much easier to define and quantify than justifications for discriminatory housing practices. *Id.* at 148. In *Huntington Branch NAACP v. Town of Huntington*, 844 F.2d 926 (2d Cir.1988), a discriminatory zoning case, the Second Circuit embraced the Third Circuit's formulation. It phrased the defendant's burden of proof as the need to present "bona fide and legitimate justifications for its action with no less discriminatory alternatives available." *Id.* at 939.

Finally, *Arlington Heights II* itself provides some guidance on burden-shifting principles. Arlington Heights claimed that its refusal to rezone a certain parcel of land for multi-family housing would not have the effect of segregating the Village because the Village would permit construction on other parcels that were zoned and suitable for such housing. 558 F.2d at 1291. The burden, however, was placed on the Village to identify an appropriate parcel. *Id.* at 1295. The court reasoned that allocating the burden any other way was illogical, as it "would compel plaintiffs to attempt the almost impossible task of proving a negative." *Id.* n. 16. Accordingly, the *Arlington Heights II* court permitted shifting the burden to the party for whom the proof was easiest. *Id.* ("It is far easier for defendant to show that a single parcel of land which is suitable does exist than for plaintiffs to show that no suitable land exists.").

■ The preceding case law analysis supports shifting the burden on the "defendant's interest" factor in this Circuit. First, the Seventh Circuit in *Dwivedi* interpreted *Arlington Heights II* as adopting Title VII's

disparate impact analysis, which, the court acknowledged, shifts to defendants the burden of proving business necessity. Second, FHA cases from other circuits that involve municipal defendants and endorse the *Arlington Heights II* approach view themselves as having filled the burden-of-proof gap that the Seventh Circuit left open. Third, *Arlington Heights II* champions burden shifting where the normal allocation of proof would prove unfairly difficult. Accordingly, it would seem that the correct approach would combine the *Mountain Side* and *Rizzo–Huntington* tests: 1) the Village has the burden of proving a bona fide and legitimate justification for adopting the TIF districts and proceeding with acquisition and demolition as it did; and 2) the plaintiffs have the burden of proving that less discriminatory alternatives were available. Under this formulation, neither party is saddled with having to prove a negative (the nonexistence of bona fide reasons or the absence of less discriminatory alternatives), and the plaintiffs do not have to guess at and eliminate the Village's reasons for proceeding in the manner it chose, something that might very well be beyond their competence. Of course, this does not change the fact that the plaintiffs bear the ultimate burden of persuading the fact-finder that the FHA was violated. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993) (ultimate burden of proof remains on plaintiff in a Title VII case).

### (ii.) The Village's Interests In Its Actions

■ Having clarified the burden of proof, we move on to review the bona fides of the Village's interests, and to ascertain whether these interests could have been accomplished with less discriminatory effect. In defense of its decision to redevelop Green Oaks and Michael Lane as part of the TIF districts, the Village offered a number of justifications, including numerous, recurring Housing Code violations, poor property maintenance, and density/lack of green space.

The evidence, although conflicting in many respects, could have been found by a rational jury to support these justifications. The Village's expert reports, testimony of city employees, and Kane McKenna's TIF qualification report reflected that the buildings in Green Oaks and Michael Lane were poorly maintained. The evidence showed that these two neighborhoods accounted for a disproportionate percentage of Housing Code violations in 1993, and that, in other years, building owners had averaged 50 to 100 citations annually. Reviewing housing inspection letters from 1992–1994, one expert opined that these violations were not minor, but rather "evidence serious safety hazards, unhealthy living conditions, and persistent lack of basic maintenance." Likewise, Kane McKenna observed that the residential areas in the TIF districts "suffer from visible exterior depreciation and lack of necessary repairs required for safety and utility needs." In Michael Lane, Kane McKenna found that building owners had not organized maintenance tasks among themselves and had failed to invest in the structures to alleviate blighting conditions. Finally, Kane McKenna reported that both neighborhoods had "too many structures located on undersized parcels," and that they were originally constructed on lots too small by current standards. The result was excessive land coverage that contributed to the areas' depreciation.

Under *Arlington Heights II,* whether the Village met its burden of proving that these were legitimate reasons for engaging in TIF-related acquisition and demolition depends on whether the Village was "acting within the ambit of a legitimately derived authority." 558 F.2d at 1293. This authority comes from the TIF statute, which requires that at least five "blighting" factors be present for an area to qualify as blighted.[20] The Village's evidence demonstrated the following "blight" factors in Green Oaks and Michael Lane: 1) deterioration; 2) presence of structures below minimum code standards; 3) overcrowding of structures and community facilities; 4) excessive land coverage; 5) depreciation of physical maintenance; and 6) lack of community planning. 65 ILCS 5/11–74.4–3. A find-

---

**20.** These factors include deterioration, presence of structures below minimum code standards, overcrowding of structures and community facilities, excessive land coverage, depreciation of physical maintenance, and lack of community planning. 65 ILCS 5/11–74.4–3(a); *see supra* note 3.

ing of blight entitles the Village to exercise its condemnation powers and to clear the blighted area by demolition—the statute does not distinguish among methods of redevelopment or establish a threshold for demolition, as opposed to less drastic measures. *See* 65 ILCS 5/11–74.4–4. Consequently, the Village could have satisfied its burden of proving to a rational jury that it had legitimate reasons to acquire for condemnation or to demolish the buildings in these areas.

But the plaintiffs would have had much more difficulty proving that less discriminatory alternatives would have proved fruitful in furthering the Village's interests. The only evidence on this point was each party's attempt to lay blame on the other for botching more benign attempts to improve Green Oaks and Michael Lane. The 1988 Camiros study recommended steps for improving building conditions, drainage, and the available space in Michael Lane, none of which involved condemning or demolishing buildings. It is unclear from the record which party was responsible for failing to implement these less drastic alternatives, or whether they would have been effective. Plaintiffs faulted the Village for failing to spell out the financing options, while the Village claimed that the building owners' unwillingness to spend money curtailed the project. In the years prior to TIF adoption, the Village attempted to improve at least some aspects of Green Oaks and Michael Lane by seeking county funding for, and spending its own money on, street, common area, and sewer projects in the neighborhoods. There is also some evidence that the Village applied for funding to rehabilitate the structures in these areas as well. Yet conditions had not improved by 1994, the year Kane McKenna came out with its study. Given this evidentiary state, the plaintiffs were much less likely than the Village to fulfill their burden of proof on the third *Arlington Heights II* component.

In sum, we find that the Village could have sustained its burden of proving legitimate justifications for engaging in TIF-based acquisition and demolition, while the plaintiffs would have had less chance of success in demonstrating the existence of less discriminatory alternatives. As such, the third *Arlington Heights II* factor may well have favored the defendants if this case had proceeded to a full resolution by trial.

#### (d.) Relief Requested

The final *Arlington Heights II* factor that we must consider is the nature of the relief that the plaintiffs sought. The Seventh Circuit draws a distinction "between requiring affirmative action on the part of the defendant and preventing the defendant from interfering with the plaintiff's attempt to build integrated housing." 558 F.2d at 1293. Courts should be more reluctant to grant affirmative relief: "To require a defendant to appropriate money, utilize his land for a particular purpose, or take other affirmative steps toward integrated housing is a massive judicial intrusion on private autonomy." *Id.*

Tracking these standards, plaintiffs attempted to style their relief as negative, not affirmative. They claimed to be asking only that the Village be enjoined from further TIF demolition and that "the status quo as it existed prior to the controversy be restored." Pl. Br. at 26. Defendants, however, pointed to the extensive prayer for relief in plaintiffs' complaint, which is not limited to any particular claim and requests that the Village be ordered to build affordable housing, establish a human rights commission, and pass a fair housing ordinance. Am.Compl. at 30, ¶¶ c, d.

Defendants correctly characterized the type of relief requested in plaintiffs' complaint. Obviously, ordering a Village to pass laws, establish commissions, and build housing to remedy disparate impact is a request for affirmative relief, which requires absolute justification under *Arlington Heights II.* Restoring matters to the status quo means, among other things, rebuilding the structures that were demolished in Green Oaks. This would have compelled the Village to take affirmative steps, not merely refrain from proceeding with TIF activities. Had the plaintiffs limited their relief to simply enjoining the Village from further demolition, this factor could have weighed in their favor. As things stood before trial, however, this last factor likely favored the Village.

#### 4. Balancing the *Arlington Heights II* Factors

We have found that two of the four *Arlington Heights II* factors favored the plaintiffs

and the two remaining factors favored the defendants. Given our determination, it is easy for this Court to conclude that a trial on the merits presented a substantial expenditure of resources for both sides with the prospect of an uncertain result. The bottom line is that this trial did not have a guarantee of success for either side. Furthermore, given the state of the applicable case law, an appeal by the losing side was almost an inevitable certainty.

In addressing the strength of the plaintiffs' case, we have limited our discussion (for the most part) to plaintiffs' disparate impact claim, which, after summary judgment briefing, was ripe for a final determination on the merits. Because plaintiffs' intentional discrimination claim was not similarly briefed, there is no evidentiary record to assist us in assessing the strength of this claim. Nevertheless, given our conclusion that the disparate impact claim could have gone either for or against the plaintiffs, and that the required showing of intent is much greater on intentional discrimination claims, we need say only that plaintiffs' intentional discrimination claim would have encountered even more obstacles to victory at trial.

### B. *Comparison of Uncertain Litigation Results to Consent Decree*

■ The relief provided in the Decree is more certain, in both its award and its breadth, than the relief plaintiffs sought contingent on winning a jury trial. The complaint requested for the class a declaration that the Village engaged in illegal conduct, an injunction against discrimination on the basis of national origin, the construction of affordable housing with a priority for those persons displaced by the Village's actions, the establishment of a human rights and fair housing ordinance and commission in the Village, notice to the plaintiffs of future Village actions affecting multifamily housing, access to Village records, posting of fair housing notices, and damages, costs and attorneys fees.

The Decree provides the plaintiffs with substantially all of the relief that they could have obtained had they prevailed at trial, and much more. First, the Decree provides that for the life of the TIF districts (which is up to 20 years), the Village is enjoined from engaging in housing discrimination based on national origin, including: (1) denying or otherwise making dwellings unavailable; (2) discriminating in the terms, conditions, or privileges of the sale or rental of dwellings or in the provision of facilities and services in connection with the sale or rental of dwellings; (3) making statements that indicate a preference, limitation or discrimination in the sale or rental of dwellings; and (4) falsely representing to any person that any dwelling is not available for inspection, sale or rental.

In addition to benefitting the residents of Addison generally with enforcement against housing discrimination, the Decree places significant limitations on the Village's ability to use TIF powers for redevelopment in Addison's two predominantly Hispanic neighborhoods. These limitations preserve eighty percent of the housing that existed in Green Oaks and Michael Lane prior to the Village's 1994 acquisition and demolition activities. While the Decree permits a limited and phased acquisition and demolition of certain buildings, it requires that these properties be redeveloped in both neighborhoods into new public parks, a community center, and the construction of new affordable housing (the redevelopment "Plan"). The Decree further provides for the construction of new affordable housing adjacent to both neighborhoods on properties that are currently entirely or largely undeveloped, and conditions the Village's use of TIF redevelopment powers on its generating this redevelopment. In short, the Decree both maintains and improves Green Oaks and Michael Lane.

The Decree also furnishes compensation to persons affected by the redevelopment. Compensation will be provided to persons who were displaced by the Village's 1994 TIF redevelopment activities in Green Oaks Court, and to those who will be displaced from that neighborhood or from Michael Lane as a result of any future redevelopment permitted under the Plan. Owners of the eleven properties that were acquired by the Village in 1994 will receive an additional twelve to fourteen percent above the property's fair market value. Each of the forty-four resident households displaced at that time will receive at least $7,000. Owners of

properties that will be acquired by the Village through eminent domain, or by the Village's permitted use of TIF powers in implementing the Plan, will receive 110–112% of the properties' fair market value; displaced resident households will receive from $2,000–$3,000 each in relocation benefits. Of the buildings the Village may acquire pursuant to the redevelopment Plan, only four are occupied by owners. As some or all of their compensation, these four owners will have the right to receive an exchange building of comparable size and with the same number of units in either Green Oaks Court or Michael Lane.

For organizational and class plaintiffs who have suffered losses other than those directly attributable to property acquisition or displacement from their homes, the Decree provides additional compensation. The three organizational plaintiffs will receive an aggregate amount of $60,000. The other class claimants will receive the opportunity to petition for a share of a $100,000 damage fund pursuant to a stipulated claims process.

Besides financial compensation, the Decree provides non-monetary relocation assistance to all persons who were displaced by the Village's 1994 acquisition and demolition and who will be displaced as a result of future redevelopment activities under the Plan. Each displaced household will be offered the opportunity to relocate to a choice of two residences in Addison. Each residence will have the same number of bedrooms as the prior residence, as well as at least 95 % of its floor space, and will rent for no more than 105 % of the former monthly rent. All alternative housing will be within 1.5 miles of the prior residence and, if required by the displaced household, will be handicapped accessible. At the option of the displaced household, at least one of the alternative dwellings will be in the same school attendance zone. All transportation costs for viewing these residences will be paid by the Village.

The Decree not only assists the plaintiffs in several respects, it also places affirmative obligations on the Village. It requires the mayor, the Village trustees, the Village manager, all employees of the Community Development Department, all zoning inspectors and code enforcement officials, and any other Village officials or employees who have responsibilities for land use-related matters to receive at least four hours of training on the mandates of the Fair Housing Act, state and local housing discrimination laws, and the terms of the Decree. The Village must create a $30,000 interest-bearing fund to finance programs that teach the Village of Addison's housing discrimination requirements. These funds will be distributed by the United States Justice Department in consultation with the Village of Addison. The Decree also permits plaintiffs' counsel to inspect periodically Village documents concerning: Green Oaks, Michael Lane, and other areas in which new affordable housing is contemplated; multifamily-unit housing code inspections and enforcement; and all complaints about residential property inspection or housing discrimination.

Finally, the Decree is in the form of an injunction, enforceable by this Court. The Court has retained jurisdiction specifically for this purpose. The portions of the Decree that apply to development and redevelopment activities will stay in effect for the life of the two TIF districts, potentially as long as 20 years, and the remaining parts of the Decree will remain in effect for seven years. The Court is empowered to enforce the terms of the Decree upon a request by anyone affected by its terms or their violation.

Absent the Decree, plaintiffs' ability to obtain any comparable relief would have been dependent on their success in proving their case at trial and overcoming the difficulties detailed in this opinion. These difficulties would have included legal uncertainties, persuading the jury as to their version of disputed facts, and, in particular, presenting adequate proof of intent to discriminate. There was also the risk that, even if the plaintiffs prevailed on the merits, this Court might nonetheless have declined to issue an injunction, or might have issued an injunction less protective of their rights then the extensive provisions of the Decree—especially in light of *Arlington Heights II*'s dim view of affirmative relief. For instance, in the Decree the Village of Addison has agreed to create public parks in both the Michael Lane and Green Oaks Court neighborhoods, and to use its efforts to promote, in and near the TIF

areas, construction of affordable owner-occupied and rental units. These are benefits to which the plaintiffs are not clearly entitled as a matter of law should they have prevailed on the merits.

In conclusion, with respect to the first fairness factor, the Court easily concludes that the extensive benefits offered in the Decree are fair, reasonable and adequate when balanced against the strength of plaintiffs' case on the merits against the defendant Village of Addison. While it is true that the plaintiffs' case was relatively strong, it is equally true that the Village had facts and law in its favor. The Decree is a fair compromise that evenly addresses the strengths and weaknesses of the parties' respective cases.

### C. *The Village of Addison's Ability To Pay*

■ There is no dispute that the Village of Addison has the ability to pay the compensation reflected in the Decree. The Village has indicated that the monies to be expended under the Decree will be derived primarily from TIF proceeds and insurance proceeds. This satisfies the second fairness factor.

### D. *Complexity, Length and Expense of Further Litigation*

■ It is certain that further litigation, absent the proposed settlement, would be extremely complex, lengthy and expensive. The factual breadth of these consolidated cases, the number of difficult legal issues they pose, the sharply adversarial relationship of the parties, and the history of the litigation all support this conclusion. Furthermore, given the stakes involved in these consolidated lawsuits, it is virtually certain that every contested ruling made before, during and after the trial would be the subject of an appeal. The trial of this matter was expected to last at least a month. Further appeals could be expected to last years.

This litigation has already been extremely expensive, and continued litigation would likely at least equal that expense again. The Court finds that the third fairness factor is satisfied.

On the subject of litigation expense, the Court wishes to pause for a moment to address the issue of attorneys' fees. It is unfortunate that some of the publicity given the Decree has tended to focus on the amount of plaintiffs' attorneys' fees and costs that it provides. While a $2.5 million attorneys' fee may seem large to the inexperienced public, the Court wishes to emphasize that this figure is a modest, compromised amount for the herculean efforts by the highly skilled and dedicated group of plaintiffs' counsel, ably led by Matthew J. Piers and the law firm of Gessler, Hughes & Socol, Ltd. It is also appropriate to point out that the Village was very ably defended by a group of highly effective municipal and trial law specialists, whom the Court safely assumes were not inexpensive.

### E. *Amount of Opposition To The Settlement/Class Members' Reactions*

The Court addresses under one heading the opposition to the proposed Decree and the class members' reactions to it. Most objections came out at the fairness hearing, and revealed that class members and nonclass members often had overlapping viewpoints. To the extent possible, we will point out any objections that are uniquely the class members'.

■ The law in this Circuit is that the Court must consider all objections, but need not state individualized findings with respect to each of them. *Armstrong v. Board of Sch. Dir.*, 616 F.2d 305, 326 (7th Cir.1980). However, the Court's reasoning must be stated "with particular clarity." *Id.* at 319. In light of this last admonition, and case law requiring a reasonable response to all objections of substance as well as some explicit statement concerning all objections, *see Mandujano v. Basic Vegetable Prods., Inc.*, 541 F.2d 832, 836 (9th Cir.1976), the Court will review all objections of substance herein. The Court may approve a fair settlement over objections by some or even many class members, and despite criticism by some named plaintiffs. *Armstrong v. Board of School Directors*, 471 F.Supp. 800, 804 (E.D.Wis.1979), *aff'd*, 616 F.2d 305 (7th Cir.1980). The number of objectors here is small by any standard.

The Village of Addison presently has approximately 32,000 residents. Prior to the fairness hearing, over 12,000 households of current and former residents and owners of residential property in the Village of Addison were mailed Court-approved notice of the proposed settlement and the fairness hearing. All the households within the two affected TIF areas received additional notices by hand delivery. All mailed and delivered notices were in both English and Spanish. The notice of the hearing was also advertised and published on three occasions in the *Addison Press* and the *Chicago Tribune,* and on two occasions in the *Chicago Sun Times,* as well as several times a week on the Village of Addison cable television access station. Finally, the notice was posted in both English and Spanish on the bulletin board by the front door of the Addison Village Hall.

Over two hundred residents, owners and interested persons attended the fairness hearing. Statements were given by thirty-four residents and representatives of the plaintiff organizations or the defendant. Of those, fewer than half presented testimony which could be construed, in whole or in part, as being in opposition to the Decree.

Of those, five persons were owners and/or residents of buildings on Lake Street at the west end of the Michael Lane TIF district, operating under the mistaken assumption that the Decree could adversely affect them. The residential buildings in this area are considered to be non-conforming uses under the Village of Addison Zoning Code; within two years, the permits for their continued non-conforming use as residences will expire. The statements of those five individuals expressed understandable concerns about how the Decree could affect their properties or residences. While the Court is sympathetic to these concerns, we emphasize that the extent to which these properties' lawful use as residences will cease is the result of existing Village zoning ordinances. The Decree has absolutely no impact on their residential status.

If, on the other hand, the Village acquires these properties in the future to implement the redevelopment Plan, these owners and residents would be entitled to the same compensation and relocation benefits that the Decree provides to other Michael Lane owners and residents. In this respect, the Decree actually gives the Lake Street owners additional rights that they do not presently hold. The bottom line is that the Decree may assist the Lake Street owners—it does not affect them adversely.

One objector criticized the Decree on the grounds that, in his opinion, the Village of Addison has not discriminated on the basis of national origin, and thus should not have to pay the sizeable amount of money involved in implementing the Decree. But the Village has not admitted discrimination in the Decree, and has indeed avoided both a potential finding of discrimination and tremendous expense by settling this case rather than proceeding to trial. A finding of discrimination would, of course, be contingent on the plaintiffs prevailing at trial. Nevertheless, the Village would incur considerable litigation expenses regardless of the outcome. Instead of risking an adverse adjudication and gambling public monies on an uncertain outcome, the Village of Addison has decided to agree to a settlement that, to a large extent, earmarks for upgrading two of its neighborhoods monies that would otherwise have been spent on litigating this case. This objector has overlooked this important aspect of this settlement.

In direct contrast to the objector above, two persons stated that they support the Decree in principle, but expressed reservations concerning certain aspects of it because they felt that the Village was, in so many words, "getting off too easy." One person opposed the Decree because he believed that the damages and attorneys' fees were excessive, one person opposed the Decree because she felt not enough was being paid (or reserved) for consequential damages, and one person opposed the Decree because she felt not enough was going to be paid for buildings that the Village would acquire in the future. Two persons who own property in the Michael Lane neighborhood but do not reside in the Village of Addison expressed opposition to the Decree because the Village had not acknowledged the existence of a "race relations problem," because they did not trust the Village, because not enough money was being paid for compensatory damages, and

because the Decree left too much "undetermined."

It is understandable that some partisans on both sides feel the Decree is too hard, too soft, too expensive, not expensive enough, too harsh or not restrictive enough. These debates are inevitable given the nature of the controversy at issue. In fact, the very existence of such wildly diametric viewpoints favors a finding that the settlement is fair.

Some class members expressed objections as well. A few complained about the absence of notice provisions in the Decree specifying when the Village will acquire specific properties, and when they must be vacated. This is, of course, a valid concern. But the Decree does specify when the Village may acquire certain properties, and for what purposes. And while the Decree allows the Village some necessary flexibility in timing its acquisitions, the nature of the agreed redevelopment Plan, which is expected to be implemented over the course of several years, ensures that it will be relatively easy for property owners and residents to request and receive ample notice as to when they will be required to sell and/or relocate. Moreover, the parties have stated that they will provide ample notice to any affected property owners. And residents will be sufficiently alerted given the Decree's mandate that the Village find, offer and present for inspection two alternative new residences before displacing any households. Consequently, there is every reason to believe that the notice provided in implementing the Decree will be reasonable—and this Court will have the power to monitor that important issue.

Another class member complained that the Decree provides only the option of, but does not require, creating additional parking in the Green Oaks neighborhood. While this objection is correct, such a detailed aspect of community development is far beyond the scope of relief likely to be granted by the Court in the event plaintiffs prevailed at trial. In addition, the proposed redevelopment of Green Oaks decreases the neighborhood's density. This will help alleviate any parking shortage in Green Oaks, whether or not the Village exercises its option to create additional parking.

The record shows one final, fairly significant objection, by Mr. Michael Lullo, the principal of certain business entities ("the Lullo Entities"). These entities are the legal or beneficial owners of two shopping centers, one of which houses a Jewel Food Store, located immediately to the south of the Michael Lane TIF district. Mr. Lullo is also a resident and owner of residential property in the Village of Addison. The Lullo Entities attempted a last-minute effort to intervene in this case. After we rejected this attempt, Mr. Lullo, by his attorneys, stated an objection to the proposed Consent Decree as a purported member of the plaintiff class.

In sum, Mr. Lullo objected on the grounds that the proposed redevelopment Plan for Michael Lane allows the Village to acquire (by eminent domain, if necessary) approximately one-third of the seven acres of vacant land located east and north of his shopping centers and south and west of the Michael lane neighborhood. Specifically, Mr. Lullo complains that: (1) his land is being unfairly taken by the Decree; (2) the Decree's proposed size and location for a Jewel Food Store in this area (shown on Exhibits 1 and 2 to the Decree) is inadequate to accommodate Jewel's desire for a new and larger store; Lullo fears that if he cannot meet this tenant's needs, the company will relocate its facility and the shopping centers will fail because of the Jewel Food Store's anchor tenancy; (3) the drawings for the same area do not show a water retention pond, which is necessary to satisfy flood prevention laws; and (4) Lullo never agreed to the Decree's proposed location of a 28–unit condominium development on what is currently paved property behind the Jewel Food Store shopping center.

Mr. Lullo's objections are, at best, based on a misunderstanding of the terms of the Decree. The Decree does not mandate that any of Mr. Lullo's property be taken. It does provide that if the Village wishes to engage in certain specified redevelopment in the Michael Lane neighborhood, it must first develop a park on property that includes part of the vacant land owned by Mr. Lullo. But all of the vacant land in question has been part of the Michael Lane TIF district since

its enactment in 1984. As such, it has been subject to a taking by the Village of Addison for almost any purpose since that time. Moreover, the Village of Addison always had eminent domain power to take private property for a public use, such as the park contemplated in this area, even absent a TIF district. In this respect, the Decree actually protects two-thirds of Mr. Lullo's vacant land to a greater extent than before.

The remaining issues raised by Mr. Lullo are potentially legitimate business concerns, but entirely beside the point with regard to this Court's approval of the Decree. The proposed condominium site to which he objects is outside the TIF district; the Decree neither mandates nor empowers the Village to take the property in question. It merely provides that if the Village wishes to engage in certain other redevelopment activities in Michael Lane, it must try to facilitate the development of affordable condominiums at that location, or elsewhere if that is not possible. Similarly, the location and size of the proposed Jewel Food Store is merely a conceptual proposition, not mandated by the Decree. According to the Village, the drawings in Exhibits 1 and 2 to the Decree were product of representations Mr. Lullo made to Village officials during negotiations in April of this year, the purpose of which was to accommodate his needs in crafting the Decree.

Likewise, the issue of what retention pond will be required for developments not mandated by the Decree and at locations outside the area affected by the Decree are matters to be discussed in negotiations with the appropriate government officials, and have nothing to do with the settlement currently under consideration by this Court. Finally, we reject Mr. Lullo's assertion that the Decree was created and is being advocated by the Village in an effort to destroy the two shopping centers, allegedly making the neighboring Michael Lane undesirable for habitation and doing indirectly what the Village has allegedly been unable to do directly (i.e., destroy the predominantly Hispanic community of Michael Lane). This accusation is wholly uncorroborated and implausible in light of this Court's extensive experience with this lawsuit.

As demonstrated above, much of the potential opposition to the Decree was based upon fundamental misunderstandings of the terms of the proposed settlement. And several more of the objectors simply expressed hostility to one side or the other of this litigation. Overall, real opposition to the Decree was very limited. This limited opposition is heavily outweighed by the considerable benefits to be gained by the plaintiff class and all Addison residents and owners if the Decree is approved.

Most of those who testified at the hearing were in favor of settlement. And many class members expressed their general support in the hopes of ending the conflict that exists in Addison. The ending of this animosity between the Village government and many of its own constituents is in and of itself an important factor militating in favor of this settlement. A trial generally produces winners and losers, which are often impossible to distinguish at the end of a long, expensive litigation. This settlement can result in far more real winners without the expense and agony of a lengthy trial.

Given the small number of persons who expressed objections to the Decree and the nature of those objections, this Court concludes that the vast majority of the members of the plaintiff class, as well as the remaining Village residents, overwhelmingly favor the proposed settlement. The Decree is a thoughtful, fair, reasonable and detailed resolution of a highly complex and hotly contested lawsuit.

### F. Presence of Collusion in Reaching A Settlement

The next consideration is possible collusion affecting the settlement. No one here has even suggested that this settlement is anything but the product of honest negotiations by otherwise vigorous adversaries. Furthermore, on this record, any such suggestion would be incredible. This Court participated as a mediator in numerous settlement conferences in this case. Each of these conferences was civil, but both sides strenuously resisted any concessions. This Court noted at the conclusion of the fairness hearing that the proposed Consent Decree was

the result of hard fought litigation, with nothing unnecessarily conceded by the extremely competent counsel for both parties. We conclude that there is absolutely no evidence of collusion in reaching a settlement.

### G. *Adequacy of Compensatory Damages*

We find that the damages provided in the decree are adequate. The Decree provides for damages, as described above, in specific amounts to owners and residents subject to past and future acquisition or displacement. The Decree's damages terms produced only two objections. One was to the adequacy of the compensation to owners who will lose their buildings as a result of future TIF redevelopment permitted under the Decree. These owners are to receive 110–112% of the properties' fair market value pursuant to a stipulated process: the parties will either submit names or agree to a list of certified appraisers, who will then be asked to assess the property valuations. One objector argues that the fair market value figure should be based on analysis of comparable properties outside the TIF district because of the allegedly depressed values of properties within the TIF district. This is perfectly within the realm of possibility under the Decree because the Decree does not require the certified appraisers to perform their appraisals in any particular manner. These appraisers may well consider the effects that the TIF districts had on property values.

The other objection was that the $100,000 damage claims fund is insufficient. But this fund is only for the benefit of claimants who have damages other than those directly resulting from the loss of their building or residence. Shortly after this suit was filed in October 1994, the parties entered into a stand-still agreement halting any further TIF development during the pendency of this case. That agreement was converted to a court order, which remains in effect to this day. Because the status quo was preserved at the very outset of these proceedings, the parties have made all reasonable efforts to minimize any damages allegedly caused by the Village's TIF redevelopment activities. Under these circumstances, there is no basis in the record for finding that $100,000 is a less than reasonable amount to redress damages other than those directly related to loss of property or residence.

### H. *Opinion Of Competent Counsel*

In determining the fairness of a class settlement, the Court is "entitled to rely heavily on the opinion of competent counsel." *Armstrong*, 616 F.2d at 325. Counsel for the private plaintiffs, the United States Department of Justice, and the defendant Village of Addison have all made strong presentations in favor of the proposed Consent Decree. When one of the parties to a settlement is an arm of the United States, charged with enforcing the federal laws at issue in the litigation, the court can "safely assume that the interests of all affected have been considered." *United States v. Board of Public Instruction*, 977 F.Supp. 1202, 1206 (S.D.Fla.1997) (internal quotations and citations omitted). Here, attorneys from the Civil Rights Section of the Department of Justice strongly support this settlement and, in fact, served as key mediators in bringing about this resolution. This alone weighs heavily in favor of approval because the able attorneys from the Department of Justice have a primary role in enforcing our civil rights laws. The Court expressly commends the Department of Justice for its pivotal role in resolving this litigation.

All counsel have represented to the Court that the two consolidated lawsuits were difficult and complex, that the negotiating process has been difficult and at arms' length, and that the Decree is a fair, reasonable and adequate disposition of these lawsuits. They have represented to the Court that this settlement, like any settlement, involved concessions on both sides that were necessary to make a final agreement possible. This Court reiterates its belief that counsel for all parties are extremely competent. Their unanimously strong endorsement of the Decree is entitled to significant weight.

### I. *Stage Of the Proceedings And The Amount Of Discovery Completed*

Finally, the advanced stage of the proceedings weighs heavily in favor of approving the settlement. The proposed Consent Decree was entered into after the com-

pletion of massive discovery, various legal and evidentiary pretrial rulings, complete briefing on a motion for partial summary judgment, and submission of a detailed final pretrial order. The settlement was entered into only after this case had twice been set for trial, and after trial preparation was virtually complete.

## CONCLUSION

The proposed settlement is a fair and reasonable resolution of complex litigation that presents difficult practical, legal, sociological and emotional challenges. All relevant factors strongly favor final approval. Thus, this Court, with a little hesitation, gives its final approval to the proposed settlement. This Court's only hesitation derives from its assumption of a new role as the principal arbiter of any disputes that may arise from future implementation of the Consent Decree. Yet, the Court remains optimistic that the incisive and thoughtful commentary provided at the fairness hearing is indicative of a new community spirit present in Addison. This new spirit, when coupled with the community benefits provided by the Consent Decree, may allow Addison to reach the elusive hallmark of a great society. In that fashion, perhaps, the Village of Addison can create a model for other suburban communities that will soon grapple with their own growing racially and ethnically diverse populations. If this goal is achieved, then everyone's efforts in this litigation will have been worth every drop of sweat and tears that this lawsuit has generated. It is time for this litigation to end and for a new Addison, stronger and united, to emerge.